UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------------X

    :

UNITED STATES OF AMERICA,             :

    :

    -v-                         :          22-cr-431 (LJL)

    :

MOISES DISLA RAMOS and JERINSON ROSARIO,    :      OPINION AND ORDER

    :

              Defendants.        :

    :

----------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

        Defendant Moises Disla Ramos ("Disla Ramos") moves to suppress evidence seized

pursuant to an August 5, 2022 search warrant for historical cell site location information (the

"Cell Site Warrant") and evidence seized pursuant to an August 9, 2022 premises search warrant

(the "Premises Warrant").  Dkt. No. 23.  Defendant Jerinson Rosario ("Rosario" and, together

with Disla Ramos, "Defendants") moves to suppress his post-arrest statements.  Dkt. No. 20.  For

the reasons set forth below, Disla Ramos's motion to suppress evidence seized pursuant to the

two search warrants is denied in part and denied in part without prejudice to renewal and

Rosario's motion to suppress his post-arrest statements is denied.

<strong>BACKGROUND</strong>

## I.    The Indictments

        Disla Ramos is charged in a three-count indictment returned by the Grand Jury on

August 9, 2022.  Dkt. No. 1.  Rosario is charged in a three-count superseding indictment also

filed on August 9, 2022 (collectively, the "Indictments").  Dkt. No. 2.  The Indictments are

identical as to charging language.  *Compare* Dkt. No. 1, *with* Dkt. No. 2.  The Indictments arise

from the alleged conduct of Disla Ramos and Rosario on or about March 31, 2022.  Disla

Ramos, Rosario, and a third individual are alleged to have lured two victims to New York from

another state for the purpose of purchasing a used Honda Accord vehicle Rosario had advertised on Facebook Marketplace.  Dkt. No. 29 at 1–2.  After the victims arrived in the Bronx, New York, Defendants and the third individual are alleged to have robbed them at gunpoint of the money they brought to purchase the car and other property.  *Id.* at 2.  Defendants and the third individual then fled the scene of the crime, but returned and demanded additional property from the victims.  *Id.*  During this second altercation, the third individual shot one of the victims in the leg, before Defendants and the third individual again fled.  *Id.*

The Indictments charge Disla Ramos and Rosario with Hobbs Act robbery in violation of 18 U.S.C. §§ 1951 and 2.  In connection with the same activity, the Indictments also charge Defendants with Hobbs Act conspiracy in violation of 18 U.S.C. § 1951 and with the use and carrying of a firearm during and in relation to a crime of violence in violation of 18 U.S.C. § 924(c)(1)(A)(i)–(iii) and 924(c)(2).

## II.    The Cell Site Warrant

The arrest of Disla Ramos arose, in part, out of information obtained pursuant to a search warrant for historical cell site data.  On August 5, 2022, the Honorable Katharine H. Parker signed a warrant for historical cell site information for two phone numbers, including one which belonged to Disla Ramos (the "Target Cellphone") and another belonging to Rosario.  *See generally* Dkt. No. 24, Ex. B.  The warrant application sought "prospective precision location and cell site data for a period of 45 days" from August 5, 2022 and "historical cell site data and toll records for the period from March 1, 2022" until August 5, 2022 (the "Requested Information").  *Id.* at USAO_000058.  The warrant application listed the "subject offenses" as Hobbs Act robbery and conspiracy to commit Hobbs Act robbery and "924(c) (use of a firearm during a crime of violence)" (the "Subject Crimes").  *Id.* at USAO_000047.  The affidavit in

support of the cell site warrant was signed by Special Agent Jonathan Eng ("Eng") of the Federal Bureau of Investigation ("FBI") (the "Cell Site Affidavit").  *See id.* at USAO_000044–59.

The Cell Site Affidavit recites information obtained from the FBI's investigation that supported the belief that the Target Cellphone belonged to Disla Ramos and that the Requested Information would lead to evidence of the Subject Crimes and would "assist law enforcement in locating . . . Disla Ramos for possible arrest."  *Id.* at USAO_000058.  The Cell Site Affidavit provided information that supported the belief that Disla Ramos was one of the two gunmen involved in the robbery and that Disla Ramos used the Target Cellphone, including in connection with the robbery.

Specifically, in the Cell Site Affidavit, Eng describes information regarding the March 31, 2022 robbery that he obtained through his conversations with other law enforcement officers, his review of documents prepared in the case, and his conversations with the victims. Based on those sources, Eng recounts that Victim-1 contacted an individual (the "Driver") by the name of "Mike Smith," via Facebook Messenger regarding an advertisement the Driver posted to Facebook Marketplace offering to sell a black 2008 Honda Accord.  *Id.* at USAO_000047.  In these messages, Victim-1 and the Driver discussed meeting in the Bronx, New York, so that Victim-1 could decide whether to purchase the 2008 Honda Accord for approximately $4000. *Id.* at USAO_000048.  Victim-1 and his cousin, Victim-2, arrived at the location in the Bronx that the Driver provided; once there, they were told by the Driver by WhatsApp to go to another location nearby.  *Id.*  When they arrived at the second location, Victim-1 observed the Driver wearing a facemask standing next to the 2008 Honda Accord.  The two victims then inspected the 2008 Honda Accord.  *Id.*  While Victim-1 was inspecting the vehicle, the victims were approached by two men wearing ski masks and brandishing firearms ("Gunman-1" and

"Gunman-2" and together, the "Gunmen").  *Id.* at USAO_000049.  The Gunmen took $5,000 in

cash from the victims, their cellphones, and the keys to Victim-2's vehicle.  The Driver and the

Gunmen then fled in the 2008 Honda Accord.  *Id.*  Shortly after, the Gunmen and the Driver

returned, the Gunmen demanded more money, and an individual identified as Gunman-1 shot

Victim-1 in the leg, before the Gunmen and the Driver again fled the scene of the crime.  *Id.* at

USAO_000049–50.

Victim-2 described that Gunman-2, who was later identified as Disla Ramos, was

wearing "a black cloth mask, a black, hooded, puffy, quilted, waist-length coat that appeared to

be waterproof" and that Gunman-2 appeared to be approximately six feet one inch tall and of

average weight.  *Id.* at USAO_000049.  Victim-1 described that Gunman-2 was wearing a black

quilted puffy coat with a hood and a ski mask.  *Id.*  Eng presented evidence consistent with these

descriptions based on his review of an exterior camera from a building in the vicinity of where

the robbery occurred.  The video shows two individuals jumping out of a Honda Accord-like

vehicle near Victim-1.  *Id.* at USAO_000050.  One of these individuals was wearing a "black,

shiny, hooded, puffy jacket," light jeans with a white cloth in the back pocket, and black shoes

with white trim.  *Id.*  Eng opines that he "believe[s] that the video . . . is depicting Victim-1 being

re-approached by Gunman-1 and Gunman-2 after they initially drove away, and shortly before

Victim-1 was shot."  *Id.* at USAO_000051.

Eng also reviewed surveillance video footage from a building one block from where the

robbery took place.  *See id.*  The video footage shows an individual resembling Gunman-2

entering the building and walking up the stairs towards an apartment on the second floor

approximately twenty-two hours before the robbery, leaving an apartment on the second floor

and the building thirty-five minutes before the robbery, and then returning to the building

4

1.5 hours after the robbery.  *See id.* at USAO_000051–53.  In the footage, the individual identified as Disla Ramos was wearing or holding the same identifying clothing worn during the robbery, including a black, shiny, quilted, hooded puffy jacket, a ski mask around his chin, light colored jeans with a white cloth in the back pocket, and black shoes with white trim.  *Id.*  Eng concludes that the image of the individual matches the description of Gunman-2 provided by Victim-1 and Victim-2 as well as the image of the individual observed in the surveillance video from the crime scene.  *Id.* at USAO_000053–54.

The Cell Site Affidavit identifies Disla Ramos as Gunman-2 based on three principal pieces of information.  First, Eng swears that an employee of the building[1] identified the individual in the building surveillance videos as a building resident.  *Id.* at USAO_000055.  Second, tenant records show that three individuals, including Disla Ramos, were residents of an apartment on the second floor of the building in question.  *Id.*  Third, Eng compared the surveillance videos from the building to a photograph of Disla Ramos maintained by the New York Police Department ("NYPD") and concluded that the individual in the surveillance video resembles the NYPD photograph of Disla Ramos.  *Id.*  Based on his review of the surveillance footage, the tenant records, and the NYPD photograph, Eng states that he had "probable cause to believe that Disla [Ramos] is the individual wearing the black puffy coat . . . , captured in the [building] surveillance cameras."  *Id.* at USAO_000055–56.

The Cell Site Affidavit also contains evidence suggesting that the Driver is Rosario and that he is connected to Disla Ramos and to the robbery.  Victim-1 described the Driver as thin, young, approximately five foot six inches tall, with a dark complexion and long hair tied in a

---

[1] The Government has identified the title of this employee.  However, for confidentiality purposes, the Court will refer to this individual as an employee of the building throughout this Opinion and Order.

bun, and possibly wearing a red coat.  *Id.* at USAO_000048.  From the surveillance video of the building in the vicinity of the robbery, the Driver appears to be wearing red outerwear with a large white design.  *Id.* at USAO_000051.  Similarly, the surveillance video from the building one block from the robbery, shows (1) a man with a red long-sleeve sweatshirt and white lettering and with long hair pulled into a bun entering the building and walking towards the second-floor apartment with the man identified as Disla Ramos twenty-two hours before the robbery, (2) "a skinny man wearing a dark red hooded sweatshirt with his hair in a bun" exiting a second-floor apartment and the building approximately thirty-five minutes before the robbery took place with Disla Ramos; and (iii) a man with long hair pulled into a bun entering the apartment with Disla Ramos 1.5 hours after the robbery.  *Id.* at USAO_000052–53.  Eng further reviewed documents prepared by law enforcement officers and body-camera footage from the May 13, 2022 arrests of Rosario and a second individual involving an accident with a 2008 black Honda Accord, with mileage and existing damage similar to that described by Victim-1.  *See Id.* at USAO_000048, -56.  Based on his review of the security footage and Rosario's arrest, Eng concludes that he has "probable cause to believe that the Jerinson Rosario is the Driver, who drove the 2008 Honda Accord during the armed robbery of the Victims."  *Id.* at USAO_000056.

Finally, the Cell Site Affidavit ties Disla Ramos to the Target Cellphone and Rosario to another cellphone.  Disla Ramos gave the number for the Target Cellphone to the NYPD on or about October 17, 2018, after he observed a vehicle strike an NYPD vehicle.  *Id.* at USAO_000057.  Rosario gave his cellphone number after his May 13, 2022 arrest.  *Id.*  Eng further ties Disla Ramos to Rosario, and both to the robbery, by attesting that the two cellphones communicated with each other approximately an hour after the March 31, 2022 robbery.  *Id.*

Based on the warrant application and Eng's affidavit, Magistrate Judge Parker issued a warrant on August 5, 2022 for prospective and historical cell site data for the period from March 1, 2022 through September 19, 2022; historical toll records from March 1, 2022 through August 5, 2022; and prospective pen register information through September 19, 2022. *See id.* at USAO_000060–64.

### III.   The Premises Warrant

On August 9, 2022, Magistrate Judge Robert W. Lehrburger signed the Premises Warrant authorizing law enforcement to search Apartment 24 located at 1114 Gerard Avenue in the Bronx, New York (the "Subject Premises") for evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 1951 (Hobbs Act robbery and conspiracy) and § 924(c) (discharge of a firearm in furtherance of a crime of violence). *See* Dkt. No. 39-1.  The Premises Warrant was supported by an affidavit signed by Eng (the "Premises Affidavit").  *See generally* Dkt. No. 24, Ex. C.  The Premises Affidavit attached, and incorporated by reference, a copy of the sealed indictment that had been returned that same day, charging Disla Ramos with Hobbs Act robbery, Hobbs Act conspiracy, and discharge of a firearm in furtherance of a crime of violence on March 31, 2022.  *See id.* Ex. A.  The Premises Affidavit provides the following facts in support of probable cause to search the Subject Premises: (1) rental records for the building listing Disla Ramos, his mother, and his mother's husband as occupants of the Subject Premises;[2] (2) the surveillance video generally described in the Cell Site Affidavit; (3) an interview with an employee of the building, who stated that Disla Ramos lived in the Subject Premises, though he did not know Disla Ramos by name; (4) prospective location information provided pursuant to the Cell Site Warrant, which showed Disla Ramos's phone in the vicinity of the Subject Premises

---

[2] Disla Ramos presented evidence that the rental records Eng reviewed were valid through November 30, 2021.  *See* Dkt. No. 24, Ex. D at 1.

during overnight hours; (5) the fact that $5,000 was taken during the course of the robbery; (6)

the clothing that Disla Ramos wore during the robbery, including light colored jeans, a dark

colored puffy jacket, a balaclava,[3] a cloth that hung from his right back pocket, and black

sneakers with white trim; and (6) the fact that Disla Ramos was in contact with Rosario

approximately one hour after the robbery.  *Id.* at USAO_005466–70.  Eng further states:

> Based on my training and experience, I know that individuals who engage in
> robberies and firearms offenses often store items used to commit their robberies,
> such as firearms, and the proceeds of their robberies, such as cash, in their
> residence.  I also know that individuals typically keep their clothes in the place
> where they live.  I therefore submit there is probable cause to believe that the
> specific clothes worn by Disla [Ramos] will be in his apartment, as well as firearms,
> ammunition, the cash stolen from the victims of the robbery, and the other items
> taken from the victims during the robbery (chain, cellphones, and Adidas-branded
> small cross-body bag).

*Id.* at USAO_005470 (cleaned up).  The Premises Warrant authorized law enforcement to seize

(1) evidence concerning the occupancy of the Subject Premises; (2) the clothing worn by Disla

Ramos during the robbery; (3) firearms; (4) ammunition; (5) cash; and (6) items taken from the

victims during the robbery, including a gold chain, cellphones, and an Adidas cross-body bag.

*Id.* Att. A at USAO_005482.

The Premises Warrant also authorized law enforcement to seize any cellphones and

storage media from the Subject Premises that "may contain electronically stored information

falling within the categories set forth" in the Premises Search Warrant.  *Id.* Att. A at

USAO_005484.  The Premises Affidavit provides three bases for probable cause to search the

electronic devices: (1) Disla Ramos and Rosario were in contact with each other approximately

one-hour before the robbery and "based on [Eng's] training and experience, . . . individuals who

engage in coordinated robberies commonly use cellphone to communicate with co-conspirators

---

[3] A balaclava is another name for a ski mask.

and keep track of co-conspirator's contact information";[4] (2) based on Eng's training and experience, there was reason to believe that the electronic devices contained location information that could link Disla Ramos to the robbery; and (3) based on Eng's training and experience, "where electronic devices are used in furtherance of criminal activity, evidence of the criminal activity can often be found months or even years after it occurred." *Id.* at USAO_005470–71. Specifically, the Premises Warrant authorized law enforcement to seize "[e]lectronic devices . . . for evidence of the Subject Offenses, described as: communications between co-conspirators of the March 31, 2022 robbery, photographs of Disla [Ramos] and the co-conspirators of the March 31, 2022 robbery, photographs of firearms and ammunition, photographs of cash, and photographs of clothing used during the robbery on March 31, 2022." *Id.* Att. A at USAO_005483 (cleaned up).

## IV.    The Arrest and Interrogation of Rosario

Rosario was arrested on the afternoon of August 9, 2022, in the baggage claim area of John F. Kennedy International Airport in Queens, New York.  Dkt No. 22, Ex. A ¶¶ 3–4.  He was approached by five to seven law enforcement officers in plain clothes who asked him his name, seized his bags and cellphone, handcuffed him, placed him in an unmarked vehicle, and drove him to a police station close to the airport. *Id.* ¶¶ 4–5.  He was then placed in a conference room and handcuffed to a metal bar. *Id.* ¶ 5.  Law enforcement officers entered the room after about an hour, and they told Rosario that they had a warrant for his failure to appear in court after being arrested in May 2022. *Id.*  He was then taken in handcuffs in an unmarked vehicle to a building in downtown Manhattan where he waited in a conference room for four or five hours.

---

[4] The Premises Affidavit also provides that Rosario "used electronic devices to lure the victims to the Bronx in order to rob them."  Dkt. No. 24, Ex. C at USAO_005470.

*Id.* ¶¶ 5–6.  At approximately 10:00 p.m., officers informed Rosario that he was under arrest and moved him to a different room, where Rosario was interrogated.  Dkt. No. 22 at 2.[5]

The officers began the interrogation by starting to read Rosario his rights and showing him the waiver form.  *Id.* Ex. E at 1.  Before the officers finished reading the first of Rosario's rights, Rosario interjected: "I don't know what you guys want me to talk about, because I don't know what you guys are trying to talk about."  *Id.*  He then stated: "I don't want to talk nothing.  Cause I don't know what's going on."  *Id.*  One agent then read Rosario his rights from a waiver form, asserting that "[a]ll this form says is, before we ask you any questions, you must understand your rights."  *Id.*  The officer concluded that he would "[g]ive [Rosario] a second, to make sure that you understand what I just read to you, if you want you can read it yourself."  Rosario responded:  "Yeah, I know all that."  *Id.*  The officer then read Rosario the last part of the consent form:  "'Consent. I have read the statement of my rights and I understand what my rights are,' which is what you just indicated to us, 'at this time, I am willing to answer questions without a lawyer present.'"  *Id.* at 2.

The following colloquy ensued:

Agent 2: . . . We'd like, to be very honest, we'd like to talk to you.

Rosario:  About what?

Agent 2:  We can't have that conversation, if you're willing to talk to us, then you have to consent[.]

Rosario:  You want me to sign?  No, I'm not— . . . .  No, I'm not signing that.  Cause I don't know what's going on.

---

[5] This fact is taken from Rosario's memorandum of law in support of his motion to suppress, because the copy of Rosario's Declaration submitted to the Court was incomplete.  The Court accepts Rosario's implicit representation that the memorandum of law accurately reflects his sworn declaration.

>   Agent 2:  If you would like to know what's going on, the only way we can tell you
>   what's going on is if you consent to speaking with us, okay.

*Id.* (cleaned up).  The conversation continued along these lines, with Rosario asking for clarity about his arrest and the agents promising clarity only after he agreed to sign the waiver, until the agents handcuffed Rosario and left the room.  *Id.* at 3–4.

Approximately ten minutes later, the two agents returned with a third agent who conducted the conversation in Spanish.  *See generally id.* Ex. F.  The third agent started by saying that he was going to "read you your rights in Spanish," to which Rosario responded, "I understand it in English" and refused to sign the waiver.  *Id.* at 1–2.  The agent then explained, "[F]or them to explain to you what's happening, you have to . . . sign that you understand your rights."  *Id.* at 2.  Rosario responded:  "But I understood them already."  *Id.*  The agents then showed Rosario his federal arrest warrant and allowed Rosario to read it.  Rosario asked what "Hoobs [*sic*] armed robbery" was.  After the translating agent asserted that it is "the charge they put on you.  Hobbs Act" and "That's what the crime you committed is called," Rosario asked again "What is that?"  *Id.* at 5.  The translating agent then stated "in order to explain it to you, we have to go through this" and pointed at the *Miranda* form.  *Id.* at 6.  The agent continued: "nothing can be explained to you unless we are in agreement of this" and again pointed to the *Miranda* form.  *Id.*  Rosario asserted that he did not "understand any of that" but the agents again insisted that he sign the waiver before they would share additional information.  *Id.*  Rosario then stated, "Let me sign it, let's see, come.  Come on, let me sign it so you talk to me."  *Id.*  The agents then gave Rosario the *Miranda* waiver in English, which he signed and one of the agents countersigned.  *Id.* at 6–7.  At that point, one of the agents asked him where he was on March 31, the day of the robbery, and Rosario began to answer the agents' questions.  *Id.* at 7.

**PROCEDURAL HISTORY**

Defendants were indicted on August 9, 2022, and their Indictments were unsealed on

August 10, 2022 after they were arrested.  Dkt. Nos. 1-4.  Defendants filed their motions to

suppress on October 24, 2022.  Dkt. Nos. 20, 23.  Defendants also filed supporting memoranda

of law, Dkt. Nos. 22, 24, and Rosario filed a supporting affirmation, Dkt. No. 21.  The

Government filed an omnibus memorandum in opposition to the motion to dismiss on

November 7, 2022.  Dkt. No. 29. Defendants filed reply memoranda on November 14, 2022.

Dkt. Nos. 32, 33.  The Court held oral argument on December 5, 2022.  *See* Dkt. No. 34.

**DISCUSSION**

This opinion addresses Disla Ramos's motion to suppress the fruits of the search

conducted pursuant to the Cell Site Warrant and the Premises Warrant.  It also addresses

Rosario's motion to suppress his statements made during his interrogation.  Defendants also

move to dismiss Count Three of the Indictments returned by a Grand Jury on August 9, 2022

against them.  Dkt. No. 25.  The motion to dismiss is not yet fully briefed; the Court will rule on

the motion to dismiss once the Government has submitted its reply memorandum to Disla

Ramos's supplemental briefing on January 6. 2022.  *See* Dkt. No. 38.[6]

---

[6] After both parties briefed this matter, *see* Dkt. Nos. 26, 29, 31, and argued the motion to
dismiss at oral argument on December 5, 2022, *see* Dkt. No. 34, Disla Ramos moved for leave to
file a supplemental memorandum in support of his motion to dismiss based on legal
developments dating from after Defendants submitted their memorandum in support of their
motion to dismiss, *see id.*; Dkt. No. 36.  The Court granted Disla Ramos's motion and directed
the Government to respond by December 20, 2022.  *See* Dkt. No. 38.  The Government
requested an extension of time to January 6, 2022 to submit its response to Disla Ramos's
supplemental briefing, to which Defendants did not object.  *Id.*  The Court granted the
Government's request.  Dkt. No. 40.  The Court will address Defendants' motion to dismiss
Count Three of the Indictment after the Government has submitted its response.

I.      **The Motion to Suppress Fruits of the Search Conducted Pursuant to the Cell Site Warrant or for a Hearing**

Disla Ramos argues that there was insufficient probable cause for the Cell Site Warrant and that, in the alternative, he has made a substantial preliminary showing entitling him to a *Franks* hearing.  *See generally* Dkt. No. 23 at 11–17.  Finally, Disla Ramos argues that the historical cell site warrant was overbroad.  *See generally id.* at 17–20.  The Court addresses each argument in turn.

A.      **Probable Cause for Cell Site Warrant**

Disla Ramos's argument that there was insufficient probable cause for the Cell Site Warrant rests on what he contends is an insufficient nexus between Disla Ramos and the alleged offenses and the omission of critical information from the Cell Site Affidavit.  Disla Ramos notes that neither the witnesses nor victims of the March 31, 2022 robbery provided the identities or detailed descriptions of the perpetrators of the offenses, that the perpetrators faces were obscured from the surveillance video of the robbery, and that the Cell Site Affidavit lacks reliable information connecting Disla Ramos to the building where he apparently lived.  *Id.* at 12–13.  He further argues that the Cell Site Affidavit is misleading because it (1) fails to disclose that the tenant records on which it relied were dated November 12, 2020 and expired November 30, 2021 and (2) fails to inform the issuing court that an individual other than Disla Ramos had been identified by NYPD facial recognition technology as the person in the surveillance video.[7]  *Id.* at 13–14.

The probable cause determination requires "a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, . . . there is a fair probability that

_____

[7] Disla Ramos also argues that the Cell Site Affidavit provided no information about the witness who identified the individual in the surveillance video as an occupant of the apartment.  Dkt. No. 23 at 12.

contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). "[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *United States v. Falso*, 544 F.3d 110, 117 (2d Cir. 2008) (Sotomayor, J.) (internal quotation marks omitted) (quoting *Gates*, 462 U.S. at 232). "A magistrate's 'determination of probable cause should be paid great deference by reviewing courts.'" *Gates*, 462 U.S. at 236 (quoting *Spinelli v. United States*, 393 U.S. 410, 419 (1969)). "[S]o long as the magistrate had a 'substantial basis for . . . conclud[ing]' that a search would uncover evidence of wrongdoing, the Fourth Amendment requires no more." *Id.* at 236 (quoting *Jones v. United States*, 362 U.S. 257, 271 (1960)).

Here, there was sufficient probable cause to support both that Disla Ramos was one of the individuals who committed the March 31, 2022 robbery and that he used the Target Cellphone. As described in detail *supra* pp. 2–7, the Cell Site Affidavit weaves a tapestry that easily supplies the probable cause necessary for the Cell Site Warrant. The Cell Site Affidavit provided more than "vague description of the perpetrators' clothing." Dkt. No. 23 at 12. It corroborated the eyewitness descriptions with evidence from surveillance video of the crime. *Id.* Ex. B at USAO_000050. It then matched the perpetrator's clothing to the clothing of an individual in contemporaneous security footage from an apartment building one block away; this footage shows an individual wearing the same clothing walking to or from an apartment on the second floor of the building on three separate occasions within twenty-four hours of the crime. *Id*. at USA_000051–53. The identification of the individual in the security footage as Disla Ramos is also based on multiple evidentiary sources. The employee of the building identified the individual in the security footage as an individual who lived on the second floor of the apartment

building, though he did not know Disla Ramos by name; the building's property records listed Disla Ramos as a resident of an apartment on the second floor; and Eng matched a photograph of Disla Ramos maintained by the NYPD to the individual in the security footage. *Id.* at USAO_000055. Finally, the Target Cellphone was identified as Disla Ramos's based on information that Disla Ramos gave to law enforcement in October 2018. *Id.* at USAO_000057. And the Target Cellphone—and by extension Disla Ramos—was tied to the crime through evidence that an individual using the phone was in contact with another participant in the crime approximately an hour after the robbery. *Id.*

To be sure, as Disla Ramos argues, none of the evidence standing alone was airtight. The victims, witnesses, and building employee did not identify Disla Ramos by name and the lease expired in November 2021. But "[t]he probable cause analysis does not require the issuing magistrate to take each piece of evidence one by one and blind herself to it if each piece of evidence does not establish probable cause when taken in isolation or is too dated or ambiguous." *United States v. Ray*, 541 F. Supp. 3d 355, 402 (S.D.N.Y. 2021). Rather, the magistrate judge examines all of the evidence together and, based on a the totality-of-the-circumstances, makes a "practical, common-sense decision . . . [whether] there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238. Here, there was sufficient probable cause for the Magistrate Judge to issue the Cell Site Warrant. The victims both gave consistent identifications, which included the distinctive clothing worn by the person who robbed them at gunpoint. Law enforcement matched these identifications with surveillance footage, including footage of the individual entering the building in question, which in turn matched the photograph of Disla Ramos from the NYPD. Although the lease was no longer current, an employee of the building identified Disla

Ramos as a resident of the building.  The Magistrate Judge could have readily concluded that it was no accident that the individual in the security footage from the robbery was also seen walking into the building shortly after the robbery and that the same individual resembled the NYPD photograph and was listed on a lease for an apartment in the building.  The Magistrate Judge could have just as readily concluded that the individual in question was Disla Ramos and that there was probable cause for the Cell Site Warrant for his phone.

### B.    *Franks* **Hearing**

Disla Ramos also has not established an entitlement to a *Franks* hearing.  Disla Ramos argues that "the glaring omission" from the Cell Site Affidavit of two facts entitles him to a *Franks* hearing:  (1) NYPD facial recognition technology identified another potential suspect from the surveillance footage and (2) the tenant records were stale as of November 30, 2021.  Dkt. No. 23 at 15.  He also argues that the Cell Site Affidavit lacked facts establishing the veracity and reliability of the building employee, who identified Disla Ramos as an individual living in the second-floor apartment.  Dkt. No. 33 at 2–3.  Disla Ramos argues that these omissions were intentional and material.  *See* Dkt. No. 23 at 15.

To obtain a *Franks* hearing,

> a defendant must make a *substantial* preliminary showing that (1) there were intentional misrepresentations or omissions in the warrant affidavit, or, in other words 'the claimed inaccuracies or omissions are the result of the affiant's deliberate falsehood or reckless disregard for the truth'; and (2) those misrepresentations or omissions were material, or 'necessary to the issuing judge's probable cause finding.'

*United States v. Nejad*, 436 F. Supp. 3d 707, 718–719 (S.D.N.Y. 2020) (Nathan, J.) (quoting *United States v. Rajaratnam*, 719 F.3d 139, 146 (2d Cir. 2013)).  In the case of an omission, recklessness may be inferred "where the omitted information was 'clearly critical' to the probable cause determination."  *Rivera v. United States*, 928 F.2d 592, 604 (2d Cir. 1991); *see*

*also United States v. Lahey*, 967 F. Supp. 2d 698, 710 (S.D.N.Y. 2013) ("In the context of reckless omissions, courts in the Second Circuit have generally asked 'whether the omitted information was clearly critical to assessing the legality of the search.'" (quoting *Rajaratnam*, 2010 WL 4867402, at *9)).  It is not sufficient, however, for the movant to show that "a reasonable person would have included the omitted information."  *Rajaratnam*, 719 F.3d at 154. "[T]o determine materiality, courts should disregard the allegedly false statements, insert the omitted truths, and determine whether there remains a residue of independent and lawful information sufficient to support probable cause."  *Nejad*, 436 F. Supp. 3d at 719 (internal citations and quotation marks omitted).  The court should "consider a hypothetical corrected affidavit, produced by deleting any alleged misstatements from the original warrant affidavit and adding to it any relevant omitted information."  *Ganek v. Leibowitz*, 874 F.3d 73, 82 (2d Cir. 2017).

Disla Ramos has not established that the Cell Site Affidavit was materially misleading. As noted above, the Cell Site Affidavit contained extensive information linking the individual who committed the armed robbery to Disla Ramos.  It would not have defeated probable cause if the agent included the document from the NYPD Detective Bureau.  The document from the Detective Bureau of the NYPD indicates that an individual other than Disla Ramos was a "Possible Match Lead" based on the surveillance video.  *See* Dkt. No. 23, Ex. E at 1.  The document states: "This is not a positive identification and is not probable cause to arrest, merely a lead.  Further investigation is needed to develop probable cause to arrest."  *Id.*  But the possible match lead provides no other information about the individual that would link him to the robbery; it does not suggest that he is in any way linked to the building where Disla Ramos lived or that he was in touch with Rosario at the time of the robbery.  Eng and the Magistrate Judge

had before them pictures of Disla Ramos from the NYPD and from the surveillance videos, evidence that Disla Ramos was associated with the building, including a positive identification from an employee of the building, where he was seen entering and exiting around the time of the robbery, and a connection between Disla Ramos and his alleged co-conspirator. At best, the NYPD facial-recognition identification would support the notion there are others who resemble the person in the surveillance video who could have been the robber and would be worth investigating. The identification does not undermine the finding that there was probable cause that the person in question was Disla Ramos. There was substantial evidence for the Magistrate Judge to include that there was probable cause, even assuming that the possible lead was included in the affidavit.

Nor would it have defeated probable cause if the Cell Site Affidavit had included additional information about the lease, including its end date. The lease did not need to definitively establish that Disla Ramos lived in the building. Rather, it was enough that it provided powerful corroborating evidence that the individual who committed the robbery was Disla Ramos and that he lived in the building. The NYPD photograph provided evidence that the individual in question was Disla Ramos, the surveillance footage showed this individual exiting and entering the floor where the premises was located around the time of the robbery, and the building employee confirmed that Disla Ramos lived in the building. The fact that the lease ended in November 2021 does little to undermine the probable cause that Disla Ramos lived in the building. Tellingly, Disla Ramos does not identify any evidence that there was a subsequent lease for the apartment with someone other than Disla Ramos or his mother and her husband or any evidence that Disla Ramos had moved from the apartment. The Magistrate Judge did not have to attribute it to mere coincidence that the individual identified as Disla Ramos in the tenant

records was seen on surveillance footage exiting and entering the second-floor of the building around the time of the robbery, was identified by the building employee as a resident of the second-floor apartment, and was tied to the robbery both through a call to his co-defendant and surveillance footage of the robbery.  With all of this information, the Magistrate Judge could have still concluded that there was sufficient probable cause to issue the warrant.  *See United States v. Riley*, 906 F.2d 841, 845 (2d Cir. 1990) ("The fact that the period covered by the rental agreement had ended seven months prior to the search of the locker did not undermine probable cause.  One of the agents contacted the storage company and determined that Riley was still renting that particular locker and had been seen using it as recently as" several weeks before.).

Finally, Disla Ramos has cited no case for the proposition that the Cell Site Affidavit should have included further facts to establish the veracity and reliability of the building employee.  The witness "was not an anonymous paid informer, but an identified bystander with no apparent motive to falsify."  *United States v. Rollins*, 522 F.2d 160, 164 (2d Cir. 1975); *see also Florida v. J.L.*, 529 U.S. 266, 270 (2000) (finding a "tip from a known informant whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated" is more likely to be truthful than an anonymous tip).  And from the very title of the witness, the affidavit conveyed to the Magistrate Judge that the witness was in a position to know the information he was relaying.  Importantly, Disla Ramos has not identified any facts that would impugn the witness's veracity or credibility.

Additionally, Disla Ramos has not established that the omissions were intentional.  "[T]he reviewing court must be presented with credible and probative evidence that the omission of information in a wiretap application was 'designed to mislead' or was 'made in reckless disregard of whether [it] would mislead.'"  *Rajaratnam*, 719 F.3d at 154 (quoting *United*

*States v. Awadallah*, 349 F.3d 42, 68 (2d Cir. 2003)). Disla Ramos has presented no evidence

that the omissions were deliberate or made with reckless disregard for the truth. "As courts in

this Circuit have recognized, it is not shocking that every affidavit will omit facts which, in

retrospect, seem significant." *United States v. DeFilippo*, 2018 WL 740727, at *2 (S.D.N.Y. Jan.

31, 2018) (internal quotation marks omitted and alteration accepted) (quoting *United States v.

Vilar*, 2007 WL 1075041, at *27 (S.D.N.Y. Apr. 4, 2007)). "All storytelling involves an element

of selectivity," *Vilar*, 2007 WL 1075041, at *27 (quoting *Wilson v. Russo*, 212 F.3d 781, 787 (3d

Cir. 2000)), and a search warrant affidavit need not "include . . . every piece of information

gathered in the course of an investigation," *Awadallah*, 349 F.3d at 67–68. Even if the omissions

can be said to be material, as described above, Disla Ramos has not established that the

omissions were "'clearly critical' to assessing the legality of the search." *Rivera*, 928 F.2d at

604. As noted above, the Cell Site Warrant contained ample evidence establishing probable

cause. The addition of the omitted information in the warrant would not have altered this

conclusion. Thus, Disla Ramos's request for a *Franks* hearing is denied.

### C.     Overbreadth

The particularity requirement mandates that a warrant (1) "identify the specific offense

for which the police have established probable cause"; (2) "describe the places to be searched";

and (3) "specify the items to be seized by their relation to the designated crimes." *United States

v. Ulbricht*, 858 F.3d 71, 99 (2d Cir. 2017), *overruled on other grounds by Carpenter v. United

States*, 138 S. Ct. 2206 (2018) (quoting *United States v. Galpin*, 720 F.3d 436, 445 (2d Cir.

2013)). "The doctrine of overbreadth represents, in a sense, an intersection point for probable

cause and particularity principles: it recognizes, in pertinent part, that a warrant's

unparticularized description of the items subject to seizure may cause it to exceed the scope of

otherwise duly established probable cause." *United States v. Wey*, 256 F. Supp. 3d 355, 382

(S.D.N.Y. 2017) (Nathan, J.).  The overbreadth doctrine thus requires that the warrant's description of the objects to be seized may not be "broader than can be justified by the probable cause upon which the warrant is based." *Galpin*, 720 F.3d at 446 (internal quotations marks and citation omitted).  It is animated by the Founders' abhorrence of the general warrant; "the concern about giving police officers unbridged discretion to rummage at will among a person's personal effects." *Arizona v. Gant*, 556 U.S. 332, 345 (2009). "[A] warrant is legally invalid for overbreadth to the extent it permits officers to search or seize items without probable cause that they contain evidence of a crime." *United States v. Kidd*, 386 F. Supp. 3d 364, 374 (S.D.N.Y. 2019).  "[B]readth and particularity are related but distinct concepts." *Ulbricht*, 858 F.3d at 102. "A warrant may be broad, in that it authorizes the government to search an identified location or object for a wide range of potentially relevant material, without violating the particularity requirement." *Id.*

Disla Ramos does not argue that the Cell Site Warrant violates the particularity requirement, nor could he.  The Cell Site Warrant identified the offenses for which law enforcement had probable cause (the robbery), the location to be searched (cellphone records), and the items to be seized and their relation to the designated crimes (historical cell site information and toll records that would establish the relationship between the individuals involved in the March 31, 2022 robbery).  Disla Ramos instead argues that the Cell Site Warrant was overbroad because it gave law enforcement information for a five-month period from March 1, 2022—thirty days before the robbery—through Disla Ramos's arrest on August 10, 2022, while the offense that gave rise to the probable cause determination occurred on a single day in a single location.  Dkt. No. 23 at 17–18.  The Government, for its part, argues that "the movements of those individuals in a relatively short period of time before the robbery and a few months after

the robbery could be critical in establishing that the user of the phone was one of the robbers"

and the prospective cell site information could assist law enforcement for locating Disla Ramos

for an arrest.  Dkt. No. 29 at 26.

Disla Ramos's argument that the warrant was overbroad presents a somewhat close

question.  This is not a case where Disla Ramos was involved in a widespread course of criminal

conduct that extended over an extensive period of time.  *See Nejad*, 436 F. Supp. 3d at 729

("[C]ourts in this Circuit have recognized that '[t]he complexity and duration of the alleged

criminal activities' may 'render a time frame less significant than in a case that required a search

for a small set of discrete items related to one or only a few dates.'" (quoting *United States v.*

*Hernandez*, 2010 WL 26544, at *11 (S.D.N.Y. Jan. 6, 2010))); *see also Ray*, 541 F. Supp. 3d at

396–97 (finding that the "totality of circumstances set forth in" the affidavit support probable

cause for six-years of location data where there was "support for the theory that [the defendant]

was engaged in a criminal course of conduct" and "was part of an extensive course of allegedly

illegal conduct").  Rather, the crime occurred on a single day, and there are no allegations in the

Cell Site Affidavit that this criminal activity commenced before or extended beyond March 31,

2022.

However, there is probable cause to believe that the data requested would tie Disla

Ramos to the crime.  Evidence from toll records of communications between Disla Ramos and

Rosario in the month prior to the robbery would help to demonstrate that the call between the

two an hour after the robbery was no accident or misdial—Rosario and Disla Ramos had a

relationship.  The same can be said about evidence of calls between the two individuals in the

four months after the robbery; they would tend to corroborate the surveillance video that showed

the two together and demonstrate that the individuals who resembled Rosario and Disla Ramos

from the surveillance were in fact Rosario and Disla Ramos.  Evidence of calls made on a date more distant from the robbery would have less probative value, but they would still tend to establish that Disla Ramos and Rosario had an association and thus that the individual resembling Disla Ramos in the video surveillance, corroborated by the witness identifications, was with Rosario during the robbery and was, in fact, Disla Ramos.

The Cell Site Affidavit also established probable cause to believe that the historical cell site information would provide evidence of the Subject Crimes.  Precision location information provides much more precise location information about a cellphone than cell site data.  *See* Dkt. No. 23, Ex. B at USAO_000046.  The information would help determine both that Disla Ramos and Rosario were in the location of the robbery at the time of the robbery and also, and importantly, could corroborate that the individual identified as living in the building near the robbery and resembling Disla Ramos was Disla Ramos, by showing where he resided.  *See United States v. Cohan*, 628 F. Supp. 2d 355, 365 (E.D.N.Y. 2009) (citing *United States v. Abboud*, 438 F.3d 554, 576 n.7 (6th Cir. 2006) for the proposition that "[e]vidence that dated from outside of the time period may be relevant to the activity within the time period.").  And probable cause existed that the prospective location information, as the Cell Site Warrant clearly stated, *see* Dkt. No. 24, Ex. B at USAO_000060–61, would aid law enforcement in locating Disla Ramos and Rosario for possible arrest.  *See In re Smartphone Geolocation Data Application*, 977 F. Supp. 2d 129, 134 (E.D.N.Y. 2013) (collecting cases) ("The Supreme Court [has repeatedly] explained that 'probable cause must be examined in terms of cause to believe that the evidence sought *will aid in a particular apprehension* or conviction.'" (emphasis added) (quoting *Warden v. Hayden*, 387 U.S. 294, 306–07 (1967))).

### D.      Good Faith

Moreover, even if there were a defect in the Magistrate Judge's probable cause determination or the Cell Site Warrant were overbroad, suppression would not be an available remedy under the good faith exception to the exclusionary rule. *See United States v. Leon*, 468 U.S. 897, 922 (1984). Under the "good faith exception," the exclusionary rule and its remedy of suppression does not apply where evidence is "obtained in objectively reasonable reliance on a subsequently invalidated search warrant." *Id.* The exception encourages law enforcement to obtain warrants and to rely upon them. Suppression of evidence obtained in reliance upon a facially valid warrant would "[p]enaliz[e] the officer for the magistrate's error," and thus not "logically contribute to the deterrence of Fourth Amendment violations." *Id.* at 921. "[S]earches pursuant to a warrant will rarely require any deep inquiry into reasonableness," *Gates*, 462 U.S. at 267 (White, J., concurring), for "a warrant issued by a magistrate normally suffices to establish" that a law enforcement officer has "acted in good faith in conducting the search," *United States v. Ross*, 456 U.S. 798, 823 n.32 (1982).

"'The burden is on the government to demonstrate the objective reasonableness of the officers' good faith reliance' on an invalidated warrant." *United States v. Clark*, 638 F.3d 89, 100 (2d Cir. 2011) (quoting *United States v. George*, 975 F.2d 72, 77 (2d Cir. 1992)). Against the "presumption of reasonableness" that attaches to a search pursuant to warrant, *see Clark*, 638 F.3d at 99, in *Leon*, the Supreme Court identified four circumstances where the exception to the exclusionary rule does not apply: (1) where the issuing magistrate has been knowingly misled; (2) where the issuing magistrate wholly abandoned his or her judicial role; (3) where the application is so lacking in indicia of probable cause as to render reliance upon it unreasonable; and (4) where the warrant is so facially deficient that reliance upon it is unreasonable. *Id.* at 100 (quoting *United States v. Moore*, 968 F.2d 216, 222 (2d Cir. 1992)).

Here, it was objectionably reasonable for law enforcement to rely upon the warrant and none of the circumstances where the good faith exception does not apply are present.  The Court has already addressed Disla Ramos's arguments that the issuing magistrate was knowingly misled and the warrant lacked probable cause, *see* Section II.A and II.B.  The Court found Disla Ramos's arguments unavailing.  Disla Ramos does not argue that the issuing magistrate abandoned her judicial role, nor could he.  Further, there is no evidence that the issuing magistrate wholly abandoned her judicial role.  The closest that Disla Ramos comes is in questioning the Magistrate Judge's assessment of the probable cause underlying the warrant, but "abandonment of judicial neutrality and detachment properly cannot be inferred from the fact that the magistrate committed legal error in his assessment of probable cause." *Clark*, 638 F.3d at 101.

The only argument that Disla Ramos raises that carries any force is that the warrant was facially deficient because it was overbroad with respect to the cell site and toll data sought.  Disla Ramos argues that the five-month period for which the Cell Site Warrant sought information renders the warrant facially deficient and reliance on it unreasonable.  However, this argument too fails.  "The standard of reasonableness in the context of suppression mirrors that in the context of qualified immunity. . . . Conversely, where there is no clearly established law establishing a warrant's invalidity, reliance on it cannot be said to be objectively unreasonable for purposes of the good-faith inquiry." *Nejad*, 436 F. Supp. 3d at 732.  Here, there is no clearly established law in this Circuit with respect to when and to what degree time limitations are required.  And, in this case, even assuming *arguendo* there was insufficient probable cause to receive five months of data, there clearly was probable cause for the Cell Site Warrant for the month immediately before and the months shortly after the robbery and for the prospective data.

"'[T]houghful and competent judges' might disagree" on where to draw the line.  *Clark*, 638
F.3d 104 (quoting *Leon*, 468 U.S. at 926).  Thus, if the Cell Site Warrant were overbroad to any
extent, the good faith exception would apply.  *See United States v. Levy*, 2013 WL 664712, at
*11 (S.D.N.Y. Feb. 25, 2013), *aff'd*, 803 F.3d 120 (2d Cir. 2015) ("For overbreadth and
particularity purposes, no controlling authority requires a specific time frame.  In these
circumstances, it cannot be said that executing officers should have realized a lack of date
limitation constituted a facial deficiency in the Search Warrant such that reliance on it would be
unreasonable."); *see also Nejad*, 436 F. Supp. 3d at 732–33 (same).

## II.    The Motion to Suppress Fruits of the Search Conducted Pursuant to the Premises Warrant

Disla Ramos next argues that the Premises Affidavit did not provide sufficient probable
cause to believe evidence of the offenses would be found at the Subject Premises, the Premises
Affidavit did not supply sufficient probable cause to seize all electronic devices at the Subject
Premises, and the search and seizure of the electronic devices pursuant to the Premises Warrant
were overbroad.  *See* Dkt. No. 24 at 20–32.  The Court addresses each argument in turn.

### A.    Probable Cause for the Premises Warrant

Disla Ramos argues that the Premises Affidavit did not provide probable cause to believe
evidence of the Subject Offenses would be located at the Subject Premises.  Disla Ramos
contends that the "broad generalizations" that he lived at the Subject Premises and statements
from Eng that individuals who engage in robberies and firearm offenses often store items used to
commit their robberies and the proceeds of their robberies in their residences were insufficient to
support probable cause that evidence of the robbery would be found at Disla Ramos's home.  *Id.*
at 20.  He further argues that "the affidavit included no direct connection between Mr. Disla
Ramos's home and the March 31 robbery to establish probable cause for the search," *id.* at 22,

and that "the passage of time between the commission of the offense and the issuance of the warrant further dampens the probable cause analysis," *id.* at 23

The Premises Warrant provided sufficient probable cause to conclude that evidence of the crimes would be located there. "The critical element in a reasonable search is not that the owner of property is suspected of crime but that there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought." *Zurcher v. Stanford Daily*, 436 U.S. 547, 556 (1978). Thus, "[t]o establish probable cause to search a residence, two factual showings are necessary—first, that a crime was committed, and second, that there is probable cause to believe that evidence of such crime is located at the residence." *United States v. Travisano*, 724 F.2d 341, 345 (2d Cir. 1983). "[A] sufficient nexus between the alleged criminal activities and the place to be searched 'does not require direct evidence and may be based on reasonable inference from the facts presented based on common sense and experience.'" *United States v. Gatto*, 313 F. Supp. 3d 551, 558 (S.D.N.Y. 2018) (quoting *United States v. Singh*, 390 F.3d 168, 182 (2d Cir. 2004)).

The Premises Affidavit provided probable cause that a crime had been committed: It attached the Indictment, reflecting that Disla Ramos had been indicted by a Grand Jury sitting in the Southern District of New York for Hobbs Act robbery and conspiracy and use of a firearm in connection with those offenses. *See* Dkt. No. 24, Ex. C at Ex. A. The Indictment provided probable cause that those crimes had been committed on March 31, 2022 and that Disla Ramos was involved in the crime. *See Kaley v. United States*, 571 U.S. 320, 328 (2014) ("The grand jury gets to say—without any review, oversight, or second-guessing—whether probable cause exists to think that a person committed a crime.").

The Premises Affidavit also supplied probable cause to believe that evidence of the crimes would be located at the Subject Premises, including the firearm used in the robbery, Disla Ramos's cellphone, and the clothing worn by Disla Ramos during the crime.  "[A]n agent's expert opinion is an important factor to be considered by the judge reviewing a warrant application."  *United States v. Fama*, 758 F.2d 834, 838 (2d Cir. 1985); *see Riley*, 906 F.2d at 845; *United States v. Saipov*, 2019 WL 3024598, at *4 (S.D.N.Y. July 11, 2019) ("The experience of the law enforcement agents involved in preparing the warrant application is particularly relevant to the analysis, as 'experience and training may allow a law enforcement officer to discern probable cause from facts and circumstances where a layman might not.'" (quoting *United States v. Gaskin*, 364 F.3d 438, 457 (2d Cir. 2004)).  Eng swore that he had been a Special Agent of the FBI for approximately seven years, was a member of the Safe Streets Task Force, had participated in numerous investigations of violent crimes, including robberies, and had participated in the execution of search warrants of physical locations and search warrants involving electronic evidence.  *See* Dkt. No. 24, Ex. C at USAO_005462.  He swore that, based on his experience and on his training, "individuals who engage in robberies and firearms offenses often store items used to commit their robberies, such as firearms, and the proceeds of their robberies, such as cash, in their residence."  *Id.* at USAO_005470.

Moreover, the probable cause determination was based on more than expert opinion alone.[8]  Eng also presented evidence that Disla Ramos and his co-conspirators in the course of

---

[8] As a result, the cases relied upon by Disla Ramos are distinguishable.  Those cases stand for the proposition that evidence that the suspect has likely committed a crime (*e.g.*, narcotics trafficking) does not in and of itself support probable cause to believe that evidence of that crime will be located in his home.  *See United States v. Brown*, 828 F.3d 375,  383-84 (6th Cir. 2016) (suspect's status as a drug dealer does not itself give rise to probable cause that drugs will be found in his home).  Here, however, probable cause was supported by more than Eng's expert opinion that one who has committed a crime tends to conceal the proceeds or instrumentalities of

the robbery took $5,000 in cash, as well as a chain, two cellphones and a small Adidas-branded cross-body bag.  *Id.* at USAO_005464–65.  He pointed to other evidence that Disla Ramos was an occupant of the Subject Premises, including surveillance video of him walking to the same floor as the Subject Premises around the time of the robbery, an interview with an employee of the building from April 6, 2022 where he confirmed that Disla Ramos lived in the Subject Premises, and, significantly, prospective location information from a phone associated with Disla Ramos that indicated that Disla Ramos was in the vicinity of the Subject Premises during overnight hours in the week before the Premises Warrant Affidavit.  *Id.* at USAO_005467–68. Contrary to Disla Ramos's assertion, law enforcement need not have had a witness who observed the contraband and the evidence of criminal activity in Disla Ramos's residence to reach the conclusion that there was probable cause that such evidence would be found in the Subject Premises.  To take one example, it was reasonable to assume that if Disla Ramos's cellphone was near the Subject Premises during overnight hours, the cellphone could be found in the Subject Premises.

Disla Ramos contends that the warrant lacked probable cause because the facts supporting it were stale—that there is no reason to believe that the firearms, ammunition, and fruits of the March 31 robbery would still be located at the Subject Premises on August 9, 2022, the date of the Premises Affidavit.  "[A] warrant lacks probable cause where the evidence supporting it is not sufficiently close in time to the issuance of the warrant that probable cause can be said to exist as of the time of the search—that is, where the facts supporting criminal activity have grown stale by the time that the warrant issues."  *United States v. Raymonda*, 780 F.3d 105, 114 (2d Cir. 2015) (internal quotation marks and citation omitted).  "In determining

---

that crime in his home

whether probable causes exists, the magistrate is required to assess whether the information

adduced in the application appears to be current, *i.e.*, true at the time of the application, or

whether it has instead become stale." *Rivera*, 928 F.2d at 602. "The law sensibly draws no

bright-line rule for staleness." *Walczyk v. Rio*, 496 F.3d 139, 162 (2d Cir. 2007). "[A]

magistrate judge is expected to consider the age of the facts in light of the conduct at issue with a

view toward ensuring that probable cause exists at the time the warrant is to be executed, not

simply at some past time." *Id.* "The key question is 'whether [it is] reasonable to believe that

the evidence sought is still in the location where it is sought, or whether so long a period of time

has passed as to make it doubtful that the evidence is still there.'" *United States v. Pizarro*, 2018

WL 1737236, at *9 (S.D.N.Y. Apr. 10, 2018) (Nathan, J.) (quoting *United States v. Salomon-*

*Mendez*, 992 F. Supp. 2d 340, 347 (S.D.N.Y. 2014)).

      "Central to the staleness question in this case is 'the nature of the property sought' and its

relationship to the location in which it was sought. . . . '[I]f the property sought is the type which

can be expected to remain in one location over a period of time, . . . probable cause reasonably

continues to exist." *Salomon-Mendez*, 992 F. Supp. 2d at 347 (quoting *United States v. Paul*,

692 F. Supp. 186, 193 (S.D.N.Y. 1988)); *see also United States v. Griffith*, 867 F.3d 1265, 1275

(D.C. Cir. 2017) ("As a general matter, the likelihood that incriminating evidence continues to

exist in the place to be searched . . . is an important consideration when assessing the existence

of probable cause."). "[P]ersonal property that is moveable or likely to dissipate over time, such

as cash or drugs" is unlikely to remain in one place for significant periods of time. *See Salomon-*

*Mendez*, 992 F. Supp. 2d at 347; *see also United States v. LaMorte*, 744 F. Supp. 573, 576

(S.D.N.Y. 1990) (noting that drugs and cash are unlikely to be maintained over time). However,

"[o]ther courts have . . . noted that such objects as clothing and weapons are likely to be retained

by the offender for some time after the crime."  2 Wayne R. Lafave, *Search And Seizure: A Treatise On The Fourth Amendment* § 3.7(a) (6th ed. 2021).

The Court finds that certain categories of items that the Premises Affidavit claimed were likely to be in the Subject Premises were stale, but that this staleness did not defeat the Premises Warrant's probable cause to search the apartment.  The robbery occurred slightly more than four months prior to the execution of the warrant.  After four months, it is unlikely that the $5,000 and other items—including a chain and handbag—would be maintained.  The Court does not dispute Eng's expert opinion that "individuals who engage in robberies . . . store . . . the proceeds of their robberies, such as cash, in their residence." Dkt. No. 24, Ex. C at USAO_005470. Rather, the Court takes issue with the assumption that $5,000 in cash and other fruit of the robbery, including the gold chain, would be maintained in Disla Ramos's residence for four months.  The cash, for example, is not such a large sum of money that, after four months, it would likely remain in the Subject Premises.  The Premises Affidavit offers no evidence to the contrary.  *See Paul*, 692 F. Supp. at 193 ("[I]t is not reasonable to infer that he would keep the $5000 cash proceeds of his illegal extortionate behavior for over five months in one place.").

The same cannot be said about Disla Ramos's firearm, ammunition, and clothing.  Count Three of Disla Ramos's Indictment charges that Disla Ramos "knowingly did use and carry a firearm, and in furtherance of [the robberies], did possess such a firearm." Dkt. No. 24, Ex. C at USAO_005477.  Notably, the Indictment does not allege that Disla Ramos discharged his firearm.  *See id.* (Disla Ramos "*did aid and abet* such use, carrying and possession of a firearm, which was brandished and discharged." (emphasis added)).  Particularly under these circumstances, there was probable cause to believe that the firearm and ammunition would be maintained at Disla Ramos's residence.  *See Pizarro*, 2018 WL 1737236, at *10 (finding that

probable cause that instrumentalities of a crime would be located in a car was not stale because the defendant "had no reason to believe any of those items would be traced back to the alleged crimes.  As no firearm was discharged in the commission of the offense, there would be no ballistics evidence.").

Nor was the probable cause that Disla Ramos's clothing would be located in his residence stale.  The surveillance video shows Disla Ramos entering his apartment after the robbery wearing distinctive clothing.  The Magistrate Judge did not need Eng's opinion that "individuals typically keep their clothes in the place where they live," Dkt. No. 24, Ex. C at USAO_005470; it is common sense that if the clothes that were worn on March 31, 2022 were in the Subject Premises on the evening of March 31, 2022 and the morning of April 1, 2022, then it was probable they would still be in the Subject Premises only a few months later.  Because there is nothing "incriminating on [the] face [of the clothing], and [the clothing] only become[s] incriminating evidence when combined with other evidence in this case," *Pizarro*, 2018 WL 1737236, at *10, the Magistrate Judge was entitled to conclude that probable cause existed to search Disla Ramos's apartment for these items.  *See United States v. Harvey*, 2022 WL 684050, at *7 (E.D.N.Y. Mar. 8, 2022) ("The attempted robbery and shooting on March 15, 2021, occurred outside [the defendant's] apartment building, which [the defendant] was seen reentering following the commission of those crimes.  Accordingly, the Court finds that the magistrate had a substantial basis for concluding probable cause existed to search his apartment for evidence related to that incident, such as the clothing [the defendant] was wearing at the time and any firearms and ammunition that [the defendant] used [over two months after the robbery].").

In this case, the staleness of some of the items—namely the fruit of the robberies—does not defeat the Magistrate Judge's finding of probable cause to issue the Premises Warrant.  There

was ample evidence that Disla Ramos was living in the Subject Premises at the time of the

robbery and that he continued to live there in the months up until and including the time of the

execution of the Premises Warrant.  There was probable cause to believe that his distinctive

clothing, his cellphone, and the firearm would be located in his apartment.  There thus was

probable cause for the Magistrate Judge to come to the "practical, commonsense decision [that]

there [was] a fair probability that contraband or evidence of a crime w[ould] be found" in the

Subject Premises.  *Gates*, 462 U.S. at 238–39.[9]

Even if the Court were to find that the Premises Warrant were based entirely on stale

information, the execution of the warrant would fall squarely within the good faith exception to

the exclusionary rule.  Even if stale, the warrant was not "so lacking in indicia of probable cause

as to render reliance upon it unreasonable."  *Leon*, 468 U.S. at 923.  The information was at most

a month or two old, not years or decades.

### B.     Probable Cause to Seize Electronic Devices

Disla Ramos argues that the Premises Affidavit did not supply probable cause to seize all

electronic devices found inside the Subject Premises and that the Premises Warrant's

authorization for law enforcement to search and seize cellphones and storage media was both

overbroad and insufficiently particularized.  *See* Dkt. No. 24 at 23–24.  Although the Premises

---

[9] Disla Ramos also relies on *United States v. Higgins*, 557 F.3d 381 (6th Cir. 2009), which is also distinguishable.  There, the Sixth Circuit held that a warrant lacked probable cause where it was based on the statement of an informant that he had obtained cocaine from a residence for which a warrant was issued.  Applying the totality-of-the-circumstances test, the court found that the warrant lacked probable cause—the informant had a motive to curry favor with the police to help himself, the affidavit contained no assertion that the informant was known to be reliable, and the police did not corroborate any of the informant's statements other than the innocent and irrelevant fact of the residence's owner.  *Id.* at 390.  In this case, by contrast, law enforcement had a surveillance video showing Disla Ramos exiting and entering the location of the Subject Premises before and after the robbery and other evidence linking Disla Ramos to the Subject Premises.

Affidavit did not supply probable cause to seize all electronic media, the Premises Affidavit supplied sufficient probable cause to seize Disla Ramos's cellphones and to conduct a search of those cellphones.

The Premises Affidavit supplied sufficient probable cause to seize the cellphones located in the Subject Premises. The Premises Affidavit established that (1) Disla Ramos was in possession of a cellphone at the time of the robbery, *see id.* Ex. C at USAO_005470; (2) Disla Ramos continued to be in possession of the same cellphone based on the prospective location information that law enforcement was receiving in connection with the Cell Site Warrant, *see id.* at USAO_005467; and (3) Disla Ramos used the cellphone to communicate with co-conspirators immediately after the crime, *see id.* at USAO_005470. There also was a basis to believe that the cellphone would be in Disla Ramos's possession at the Subject Premises; location information from the preceding week established that the cellphone was in the vicinity of the Subject Premises at night, which is consistent with Disla Ramos (and the cellphone) being located at the Subject Premises. *See id.* at USAO_005467. Critically, there was reason to believe that the cellphone would contain evidence of the crime. The crime was committed with the use of a cellphone by Disla Ramos's co-conspirator, and there was evidence that Disla Ramos's cellphone and Rosario's cellphone were in contact one hour after the robbery. *See id.* at USAO_005470. If Disla Ramos's co-conspirator used a phone in connection with the robbery and if Disla Ramos's phone communicated with his co-conspirator's phone directly after the robbery, there was a fair probability, indeed a strong possibility, that the cellphone would contain evidence of Disla Ramos's connection with the co-conspirator and of his connection to the crimes. *See Harvey*, 2022 WL 684050, at *6 ("[T]he fact that [the defendant] was recorded using a cellphone moments after the March 15, 2021, attempted robbery and shooting establishes

the evidentiary nexus between his cellphone and criminal activity.").  At a minimum, the

cellphone would provide evidence of Disla Ramos's connection to Rosario and thereby evidence

that the individual in the surveillance video who resembled Disla Ramos and who was in

Rosario's company at the time of the robbery was in fact Disla Ramos.  The Premises Affidavit

also established that the perpetrators stole two cellphones from the victims, which, unlike cash,

might still be located in the Subject Premises several months after the robbery.  *See* Dkt. No. 24,

Ex. C at USAO_005464.

The probable cause to seize the cellphones located in the apartment was further supported

by Eng's "training and experience."  Dkt. No. 24, Ex. B at USAO_005470.  As Eng attested,

"[I]ndividuals who engage in coordinated robberies commonly use cellphone [*sic*] to

communicate with co-conspirators and keep track of co-conspirator's contact information" and

"[a]s a result, they often store data on their cellphones related to their illegal activity, which can

include logs of online 'chats' with co-conspirators; email correspondence; and contact

information of co-conspirators, including telephone numbers, email addresses, and identifiers for

instant messaging and social media accounts."  *Id.*  Eng further swore that, based on his training

and experience, "electronic devices like cellphones keep track of a user's location, and therefore,

may contain data that would allow law enforcement to place the user of the phone in the location

of a particular event, such as a robbery" and that "where electronic devices are used in

furtherance of criminal activity, evidence of the criminal activity can often be found months or

even years after it occurred."  *Id.* at USAO_005470–71.  Finally, in addition to Disla Ramos's

cellphone, there was evidence that the robbery proceeds included the two cellphones of the

victims.  Since the victims were contacted by cellphone, those phones too would not only be

evidence of the crimes but also would be fruits of the crime.  *See United States v. Smith*, 2021

WL 2982144, at *11 (D.D.C. July 15, 2021) ("Here, by contrast, law enforcement (1) knew that

defendant owned a phone; (2) knew that he had used the phone to engage in in the relevant

offense; and (3) knew based on experience that information relevant to the offense might be

spread or shared across different device.").

Disla Ramos relies on the decision of the D.C. Circuit in *United States v. Griffith*, 867

F.3d 1265 (D.C. Cir. 2017), to argue that there was not probable cause to seize the cellphones.

There, the D.C. Circuit held that a search warrant that authorized law enforcement to search the

home of a murder suspect for "all electronic devices to include, but not limited to cellular

telephone(s), computer(s), electronic tablet(s), devices capable of storing digital images," lacked

probable cause where the search warrant affidavit conveyed no reason to believe that the suspect

owned a cellphone, much less that the device would be located in his home and would contain

incriminating evidence about the suspected offense.  *See id.* at 1273–75; *see also id.* at 1268 (The

warrant application "offered almost no reason to suspect that Griffith in fact owned a cell phone,

or that any phone or other device containing incriminating information would be found in his

apartment.").  The defendant in *Griffith* was suspected of a homicide that had been committed

more than a year prior to the search.  During most of the intervening period, he had been

incarcerated; he had just "completed a ten-month period of confinement, during which he of

course had no ongoing access to a cell phone; and at least one person in his circle—his potential

co-conspirator . . . was known not to have a cellphone." *Id.* at 1272.  "What is more, even in the

event that Griffith, after his release, recovered possession of the same phone he had owned at the

time of the crime, he would have had ample opportunity to delete incriminating information from

the device by the time of the search (which occurred more than four months after his release)"

and every incentive to do so—"he had become aware of the investigation of him by the time of his release."  *Id.* at 1274.

This case is thus readily distinguishable from *Griffith*.  Here, the Premises Affidavit provided probable cause that (1) Disla Ramos owned a phone that probably would be located in the Subject Premises; (2) he used the phone to contact a co-conspirator directly after the robbery; (3) the phone had been used by Disla Ramos in proximity to the Subject Premises during the week before the warrant was executed; (4) the agent knew, based on experience, that the phone would contain evidence of the call and additional evidence of the crime; and (5) there is no indication that Disla Ramos was aware of the investigation and thus had no incentive to delete incriminating evidence.  *See Smith*, 2021 WL 2982144, at *11 (distinguishing *Griffith* because "law enforcement (1) knew that defendant owned a phone; (2) knew that he had used the phone to engage in in the relevant offense; and (3) knew based on experience that information relevant to the offense might be spread or shared across different devices").

Disla Ramos also argues that the warrant was insufficiently particularized by permitting the seizure of all cellphones, when law enforcement knew the model and serial number for each of the victims' phones that were taken in connection with the robbery.  Dkt. No. 24 at 25.  The Premises Warrant, however, cannot be invalidated on these grounds.  The Second Circuit has "emphasized that 'a failure to describe the items to be seized with as much particularity as the circumstances reasonably allow offends the Fourth Amendment because there is no assurance that the permitted invasion of a 'suspect's privacy and property are no more than absolutely necessary.'"  *Galpin*, 720 F.3d at 446.  The circumstances here did not allow law enforcement to describe Disla Ramos's cellphone with any greater detail; though law enforcement had more particularized information about the victims' cellphones, they did not have more particularized

information about Disla Ramos's cellphone.  The Government thus was justified in seizing all

cellphones during the Premises Search in order to ensure that it had seized Disla Ramos's

cellphone.  *See United States v. Young*, 745 F.2d 733, 759 (2d Cir. 1984) ("Courts tend to

tolerate a greater degree of ambiguity where law enforcement agents have done the best that

could reasonably be expected under the circumstances, have acquired all the descriptive facts

which a reasonable investigation could be expected to cover, and have insured that all those facts

were included in the warrant."); *Griffith*, 867 F.3d at 245 ("There may be circumstances in which

police have probable cause to seize a phone, yet still lack specific information about the phone's

make or model. . . . In that sort of situation, we recognize that some innocuous devices would

need to be examined, at least cursorily, to determine their relevance to the investigation."

(internal quotation marks and citation omitted)); *Smith*, 2021 WL 2982144, at *7 ("Defendant

presents no reason to believe that law enforcement, at the time of the search, could specifically

identify the cell phone in question, and presents no authority that a warrant must provide

sufficient detail to identify precisely the phone belonging to an individual that was used for a

given purpose . . . where agents could not have known which device a defendant used to engage

in the conduct relevant to the search, courts have upheld warrants broadly authorizing the seizure

of '[a]ny computers, cell phones, and/or electronic media that could have been used as a means

to commit' [the] described offenses." (internal citation omitted)).[10]

---

[10] The Sixth Circuit decision in *Wheeler v. City of Lansing*, 660 F.3d 931 (6th Cir. 2011), upon
which Disla Ramos relies, is readily distinguishable.  In that case, the court held that a search
warrant with respect to a robbery suspect that authorized law enforcement to seize (among other
items) "computer and stereo equipment, cameras, DVD players, video game systems, big screen
televisions, necklaces, rings, and other jewelry [and] music equipment [and] car stereo
equipment" was insufficiently particularized and constitutionally overbroad because it listed only
"broad categories of property to be seized" when law enforcement had in its possession a wealth
of detailed information as to the particulars of the alleged stolen property.  *Id.* at 941.  The court
noted that the warrant "provid[ed] no basis to distinguish stolen items from [the suspect's] own

It does not, however, follow that law enforcement had sufficient probable cause to seize *all* electronic devices located on the premises. Eng references "electronic devices" twice in the Premises Affidavit.[11] First, he asserts that "Rosario used electronic devices to lure the victims to the Bronx in order to rob them." Dkt. No. 24, Ex. C at USAO_005470. Next, he attests that, based on his training and experience, "electronic devices *like cellphones* keep track of a user's location, and therefore, may contain data that would allow law enforcement to place the user of the phone in the location of a particular event." *Id.* (emphasis added). Based on these assertions, the Premises Affidavit concluded "that evidence of this criminal activity . . . is likely to be found . . . on electronic devices and electronic media found in the Subject Premises," *id.* at USAO_005471, and the Premises Warrant authorized the seizure of "any cellphones and storage media that may contain any electronically stored information," *id.* at USAO_005484.

The Premises Affidavit provided no reason to believe that evidence of the crime would be found on electronic devices other than the cellphone in Disla Ramos's apartment. It draws no link between Disla Ramos's cellphone, which was clearly implicated in the criminal activity, and other electronic storage media that Disla Ramos may own. To the degree that the Government's argument that Rosario's "use of electronic devices to lure the Victims to the Bronx in order to rob them" suggests that Disla Ramos would also have non-cellphone electronic devices with

_____

personal property," *id.* at 941, and held that "when dealing with common items that can be possessed legally, . . . specificity is especially important," *id.* at 942. In this case, by contrast, there is no indication that law enforcement had a wealth of detailed information that was not reflected in the search warrant. The Premises Warrant was not required to provide more details regarding the specific electronic devices to be seized, because further details regarding the particulars of the electronic devices were not available.

[11] Eng also attests that "evidence of criminal activity can often be found months or even years after it occurred" on electronic devices. Dkt. No. 24 at USAO_005471. This reference does not establish that there was probable cause on the electronic devices; rather, as the remainder of the paragraph in the Premises Affidavit makes clear, it helps establish that if there *is* probable cause to seize the electronic devices, the probable cause is not stale due to the passage of time. *See id.*

evidence of the crime, this argument lacks merit.  Dkt. No. 29 at 24.  The fact that one co-conspirator used an electronic device in a certain way does not alone create probable cause that another co-conspirator did too.  If the Premises Warrant, through Eng's expert opinion or otherwise, had established that Disla Ramos used electronic storage media other than cellphones in connection with the crime or that, regardless whether there was information that Disla Ramos personally used electronic storage devices, persons who engage in commit similar to that of Disla Ramos store evidence of their crime on other electronic devices, then there might be probable cause to seize all electronic devices in the Subject Premises.  As presented to the Magistrate Judge, however, the threadbare and conclusory references to electronic storage media in the Premises Affidavit are insufficient to establish probable cause.  *See Ray*, 541 F. Supp. 3d at 391–92 (finding probable cause to seize all electronic devices and cellphones where underlying affidavit provided reasonable belief that suspect's cellphones *and* "laptop and desktop computers" were used in commission of crimes).

This is not a case where the warrant alleged that the defendant "use[d] [the electronic devices] in connection with his [crime]" and that there was "probable cause to believe that evidence, fruits, and instrumentalities of the [charged offenses]" would be found on Disla Ramos's electronic devices other than his cellphone.  *Ulbricht*, 858 F.3d at 100.  But the law demands such a showing, and in this respect, the warrant was overbroad, allowing it to reach items for which there was no probable cause to seize.  *See Galpin*, 720 F.3d at 446 ("[A]n otherwise unobjectionable description of the objects to be seized is defective if it is broader than can be justified by the probable cause upon which the warrant is based." (internal quotation marks omitted) (quoting 2 Wayne R. LaFave, *Search and Seizure: A Treatise On The Fourth Amendment* § 4.6(a) (5th ed. 2012)).

Neither Disla Ramos nor the Government has presented information that any non-cellphone electronic devices were seized during the execution of the Premises Warrant. Therefore, there is no occasion for the Court to determine what relief, if any, Disla Ramos might be entitled to as a result of any seizure of non-cellphone electronic devices.  The motion to suppress the evidence gained from the seizure of non-cellphone electronic devices is thus denied without prejudice to renewal should it be the case that the Government seized non-cellphone electronic devices.[12]

### C.    The Search of Electronic Devices

Finally, Disla Ramos argues that the aspects of the warrant authorizing the search of the electronically stored information are overbroad.  The warrant signed by Magistrate Judge Lehrburger gave law enforcement the authority to review electronically stored information contained in Disla Ramos's cellphone for "information responsive to the warrant."  *See* Dkt. No. 39-1 at ECF p. 6.  That information included all "communications between co-conspirators of the March 31, 2022 robbery, photographs of DISLA RAMOS and the co-conspirators of the March 31, 2022 robbery, photographs of firearms and ammunition, photographs of cash, and photographs of the clothing used during the robbery on March 31, 2022," as well as evidence concerning occupancy or ownership or the Subject Premises, clothing worn by Disla Ramos, firearms, ammunition, and cash and items taken from the victims.  *Id.* at ECF pp. 4–5.  Although it permitted law enforcement personnel to "use various techniques to locate information responsive to the warrant" and was not prescriptive as to the exact techniques it should use, the warrant also directed law enforcement to "make reasonable efforts to search only for files,

---

[12] The Court observes that suppression of *all* evidence seized pursuant to the Premises Warrant is unlikely to be an appropriate remedy in this case.  At the very least, the "constitutionally infirm" portion of the Premises Warrant appears severable from the remainder of the warrant.  *See Galpin*, 720 F.3d at 447–50.

documents, or other electronically stores information with the categories identified in" the warrant.[13]  *Id.* at ECF p. 7.  Disla Ramos argues that this authorization was overbroad and lacked sufficient particularity because it was neither time bound nor contained a "limitation on even the data that would be considered responsive to the warrant."  Dkt. No. 24 at 30; *see also* Dkt. No. 32 at 18–19 (arguing that authorization to review photographs and communications between "co-conspirators" lacked probable cause and was insufficiently particularized).  The warrant, in Disla Ramos's view, thus permitted "a limitless search and seizure of [Disla Ramos's] private cell phone data to mine for information related to a single day."  *Id.*  He further argues that the warrant lacked particularity, because it failed to specify who the coconspirators were, giving law enforcement unlimited discretion to search the cellphone for evidence of communications and photographs with anyone.  Dkt. No. 33 at 18–19.

The Court has already detailed the relevant legal principles.  *See supra* pp. 13–14, 20–21.  In the digital search context, the Second Circuit has instructed that courts are to apply "a heightened sensitivity to the particularity requirement in the context of digital searches" given the scope of personal information potentially involved.  *Galpin*, 720 F.3d at 447.  The "seizure of a computer hard drive, and its subsequent retention by the government, can give the government possession of a vast trove of personal information about the person to whom the drive belongs, much of which may be entirely irrelevant to the criminal investigation that led to the seizure."  *United States v. Ganias*, 824 F.3d 199, 217 (2d Cir. 2016) (*en banc*); *see also Riley v. California*, 573 U.S. 373, 393, 396–97 (2014) ("Cell phones differ in both a quantitative and a qualitative sense from other objects . . . .  A phone not only contains in digital form many sensitive records

---

[13] The warrant also stated: "law enforcement personnel are authorized to conduct a complete review of all the ESI from seized devices or storage media if necessary to evaluate the contents and to locate all data responsive to the warrant."  Dkt. No. 30 at ECF p. 7.

previously found in the home; it also contains a broad array of private information never found in a home in any form—unless the phone is."). "The potential for privacy violations occasioned by an unbridled, exploratory search of a [digital device] is enormous." *Galpin*, 720 F.3d at 447.

As described above, the Premises Affidavit established probable cause to believe that Disla Ramos's cellphone would contain "communications between co-conspirators of the March 31, 2022 robbery." Dkt. No. 39-1 at ECF p. 5. Disla Ramos was in contact with his co-conspirator at or about the time of the robbery. It thus was reasonable to believe that the phone would contain evidence of that contact and other contacts between them. Such records would provide powerful evidence of Disla Ramos's guilt. In addition, Eng swore that "individuals who engage in coordinated robberies . . . often store data on their cellphones related to their illegal activity." Dkt. No. 24 at USAO_005470. He also swore that "where electronic devices are used in furtherance of criminal activity, evidence of the criminal activity can often be found months or even years after it occurred." *Id.* at USAO_005471. There thus existed probable cause for law enforcement to search the cellphone for evidence of Disla Ramos' communications with his co-conspirators.

"The warrant's failure to specify who apart from Mr. Disla Ramos and Mr. Rosario would be considered a 'coconspirators' for purposes of the search" does not make the warrant "overbroad and unparticularized." Dkt. No. 33 at 18. As Disla Ramos acknowledges, "three individuals are alleged to have committed the subject offenses." *Id.* There thus was probable cause to believe that communications and other evidence of a relationship with an individual other than Rosario who was also involved in the robbery existed (*i.e.*, the warrant was not overly broad). Similarly, the description is not unparticularized; there is no indication that law enforcement knew the identity of the other co-conspirator at the time the warrant application was

43

written and the Fourth Amendment permits "some ambiguity" when circumstances require. *Galpin*, 720 F.3d at 446; *see also George*, 975 F.2d at 76 (holding that the "items to be seized" must only be described "with as much particularity as the circumstances reasonably allow").

Disla Ramos makes two related arguments with respect to the remaining categories of items to be seized during the search of electronic devices, namely "photographs of DISLA [RAMOS] and the co-conspirators of March 31, 2022 robbery, photographs of firearms and ammunition, photographs of cash, and photographs of the clothing used during the robbery on March 31, 2022." Dkt. No. 24, Ex. C at USAO_005483. First, he argues that these descriptions were insufficiently particularized because they were not time bound and lacked other limiting descriptions of the data that could be seized. *See* Dkt. No. 33 at 14–15. Next, he argues that there was no probable cause to search for and seize these items (*i.e.*, the warrant was overbroad). *See id.* at 19–20.

At first glance, Disla Ramos's argument that the warrant was insufficiently particularized has some force. A warrant unbounded by time and descriptions raises substantial constitutional questions. The warrant, however, was not so unbounded and thus this argument lacks merit. Courts in this Circuit have found warrants insufficiently particularized, as relevant here, where the warrant failed to limit the evidence that could be seized, *see United States v. Buck*, 813 F.2d 588, 592 (2d Cir. 1987) (finding "search warrant to seize any papers, things or property of any kind relating to previously described crime" insufficiently particularized because it "only described the crimes—and gave no limitation whatsoever on the kind of evidence sought"), or failed to identify the crime for which evidence was sought, even if the categories of evidence are specifically identified, *see Wey*, 256 F. Supp. 3d at 364–65, 384–85 (finding warrant that listed specific categories of documents to be seized insufficiently particularized because the warrant

itself did not reference the crimes under investigation).  Neither circumstance is present here:  the Premises Warrant both lists specific categories of items to be seized in the search of electronic information (*e.g.*, "photographs of firearms and ammunition") and limited these categories "to evidence of the Subject Offenses," which in turn were defined in the Premises Warrant as the three offenses with which Disla Ramos was charged.  *See* Dkt. No. 39-1 at 2.  Thus, the potentially broad categories of "photographs of firearms and ammunition," "photographs of cash," and "photographs of DISLA [RAMOS] and the co-conspirators" were sufficiently particular.  *See United States v. Mendlowitz*, 2019 WL 1017533, at *9 (S.D.N.Y. Mar. 2, 2019) (finding warrant sufficiently particular because "every sub-paragraph of the list of evidence to be seized is modified by introductory language limiting the search to evidence of the scheme and thus ensures that each category of evidence was expressly limited to the specified crimes at issue"); *Hernandez*, 2010 WL 26544, at *10 (same).

Nor does the lack of an explicit time limitation make the authorization for the electronic information overly broad.  Given the nature of the crime, and the issues regarding identification of the perpetrators of the robbery, any evidence of communications or a relationship among Disla Ramos and those who engaged in the robbery would be relevant.  *See Pinto-Thomaz*, 352 F. Supp. 3d at 307 (holding that warrant for evidence of relationship between defendants and his co-defendants and associates was not overbroad because it was relevant to the crime and thus justified by probable cause).  Moreover, "photographs of the clothing used during the robbery on March 31, 2022" would be relevant evidence of his commission of the robbery regardless of when they were taken—they would tend to establish that the person in the surveillance videos was Disla Ramos.  Those descriptions are thus sufficiently particularized.

Similarly, the authorization to search for photographs of firearms, ammunition, and cash are sufficiently particularized because they reference the specific crimes at issue. In this context, the Premises Warrant authorizes the search of "photographs of cash" and "photographs of firearms and ammunition" that are "evidence of the Subject Offenses," which occurred on March 31, 2022. Thus, the Premises Warrant does not authorize law enforcement to search for pictures of Disla Ramos in possession of cash from before the robbery; such pictures would not be "evidence of the Subject Offenses." Nor does it authorize law enforcement to search for photographs of Disla Ramos in the company of a generic firearm or ammunition from years earlier. Pictures of guns unrelated to the robbery, either temporarily or in other characteristics, cannot be evidence of the Subject Offenses. Based on the information in the Premises Warrant, law enforcement would have no right to search the cellphone to determine whether Disla Ramos had cash earlier than the date of the robbery or that, years earlier, he took a picture of a firearm. These items thus "were effectively time-limited" by reference to the crimes at issue, *Pinto-Thomaz*, 352 F. Supp. 3d at 306, not an invitation to indiscriminately search through Disla Ramos's phone.

Disla Ramos's argument that there was insufficient probable cause to reach photographs on the seized phones presents a closer question. The Premises Affidavit did not provide specific evidence for the other categories of electronic evidence listed in the Premises Warrant. Such a showing, however, is not required to establish probable cause. "[T]he affidavits for search of a device or account do not have to provide specific evidence that every category of evidence sought will be present in that device or account, but can rely on the affiant['s] training, experience, and the totality of the circumstances to support a 'common-sense' probability that the evidence may be found there sufficient for probable cause." *Pinto-Thomaz*, 352 F. Supp. 3d

at 306 (quoting *Singh*, 390 F.3d at 182); *see United States v. King*, 2022 WL 875383, at *4

(S.D.N.Y. Mar. 24, 2022) (finding probable cause to search a phone when agent swore that those

who have unlawfully possessed firearms store pictures and videos of the firearms on their

cellphone and the cellphone could contain pictures of the suspect wearing identifiable clothing).

With respect to the photographs of Disla Ramos with coconspirators, common sense supports the

probability that these photographs would be on Disla Ramos's phone.  The Premises Affidavit

established that Disla Ramos and Rosario were in communication.  *See* Dkt. No 24, Ex. C at

USAO_005470.  Based on the fact that there was an existing connection between the individuals

and an understanding of how cellphones are used, the Magistrate Judge could conclude that

photographs of the co-conspirators might exist on Disla Ramos's cellphone.  Similarly, the

Magistrate Judge could conclude that pictures of Disla Ramos's distinctive clothing would

appear on his cellphone; cellphones can contain hundreds or thousands of pictures and there is a

fair probability that one of them would capture Disla Ramos's jacket or shoes.

There was not, however, probable cause to root through Disla Ramos's cellphone to

search for and seize "photographs of firearms and ammunition" and "photographs of cash."  The

Second Circuit has emphasized the risk to privacy occasioned by searches of electronically

stored information and that warrants authorizing such searches warrant heightened scrutiny.  *See*

*Galpin*, 720 F.3d at 447.  At the very least, there must be a basis in the agent's training and

experience and the totality of the circumstances to support the common-sense probability that the

"category of evidence sought will be present" in the electronic devices to be searched.  *Pinto-*

*Thomaz*, 352 F. Supp. 3d at 306.  Here, the Premises Affidavit was silent as to the existence of

relevant photographs on Disla Ramos's cellphone, so the Magistrate Judge was required to rely

on the totality of circumstances and his common sense.  Although this common sense may

support the conclusion that a cellphone will contain photographs of the cellphone's owner and

his associates, it does not support the conclusion that a cellphone will contain pictures of the

instrumentalities and fruits of his crimes.  In fact, common sense might well support the opposite

conclusion; criminals might be careful to ensure that evidence of their crimes is not readily

accessible.  And this common-sense conclusion—that Disla Ramos would not store direct

evidence of the crime on his cellphone—is supported by the Premises Affidavit.  In the Premises

Affidavit, Eng only pointed to a single point of contact between the two named co-conspirators.

*See* Dkt. No. 24 at USAO_005469–70.  The fact that the Government could only identify a

single call between the named co-conspirators, despite the resources and information at the

Government's disposal, would tend to rebut any conclusion that Disla Ramos recklessly took

pictures of the weapons used in his criminal activity and the fruits of his crimes.  By permitting

the Government to examine every nook and cranny of Disla Ramos's cellphone for pictures of

firearms, ammunition, and cash, without regard to whether it was otherwise permitted to search

in those locations, the Premises Warrant permitted a search far more extensive than the Fourth

Amendment allows.  In effect, on the basis of a single phone call and Eng's statements about

evidence of communications on cellphones, the Premises Warrant permitted the Government to

search through a "vast trove of personal information . . . , much of which may be entirely

irrelevant to the criminal investigation that led to the seizure," *Ganias*, 824 F.3d at 217, on the

oft-chance (however unlikely) that there might be a picture of the fruits or instrumentalities of

his crimes.

The Court's decision in *United States v. King*, which the Government cites in support of

its argument that it was a reasonable inference that photographs of contraband would be found

on Disla Ramos's phone, *see* Dkt. No. 29 at 25, is instructive.  In *King*, the court found that

probable cause existed to search a suspect's phone for "[e]mails, text messages, chats, instant messages, *images, photographs, videos*, or voicemails evidencing commission of the Subject Offense," namely violations of Title 18 United States Code, Section 922(g) (felon in possession of a firearm). 2022 WL 875383, at *2 (emphasis added). In the supporting affidavit, the agent swore that "individuals who engage in the unlawful possession of firearms store records related to these activities on cellphones, including photographs and videos of firearms, and communications regarding the acquisition of firearms." *Id.* at *4. The court thus concluded that "this testimony provided a fair probability that evidence of the crime would be found on the Phone." *Id.*; *see also United States v. Wells*, 2021 WL 5401494, at *2, *6 (S.D.N.Y. Nov. 18, 2021) (finding probable cause to search phones for "evidence of identity theft and bank fraud, including contact information, call logs, voicemail messages, texts, email messages, messages on social media applications, calendar information, location data, bank records, and other evidence related to the subject offenses" because the special agents attested to the fact that "perpetrators of bank fraud and identity theft store records of their criminal activity on cellphones" and "presented facts indicating that defendant connected with individuals via online dating and other social media applications, text messages, and calls to advance various fraud scheme"). Here, the Premises Affidavit was devoid of any similar attestations. Eng did swear that, based on his training and experience, "individuals who engage in coordinated robberies . . . often store data on their cellphones related to their illegal activity." Dkt. No. 24, Ex. C at USAO_005470. However, this statement was directed specifically towards evidence of communications that would evince a relationship among the co-conspirators, not evidence of contraband; Eng provided an illustrative list of the kinds of evidence those engaged in coordinated robberies store on their cellphones, including "logs of online 'chats' with co-conspirators; email

correspondence; and contact information of co-conspirators, including telephone numbers, email addresses, and identifiers for instant messaging and social medial accounts." *Id.*

In fact, the Government implicitly acknowledged deficiencies in Eng's Premises Affidavit through both its briefing and during oral argument. In its brief in opposition to Disla Ramos's motion to suppress, the Government argued that "it [was] a fair inference, based on Special Agent Eng's training and experience, that photographs of specific clothing worn during the robbery, which Disla Ramos had previously worn, could be found on the phone beyond the date of the robbery." Dkt. No. 29 at 27. Notably, the Government did not argue that the presence of photographs of firearms and ammunition or of cash would logically follow from Eng's statements in the Premises Affidavit. Similarly, during oral argument, the Government acknowledged that "agent probably should have added . . . additional information into the affidavit" when questioned about the information lacking from the Premises Affidavit with respect to the photographs of clothing or co-conspirators. *See* December 5, 2022 Hearing Tr. 54. The statement applies with equal force to the photographs of firearms, ammunition, and cash.

The Court thus finds that the Government had probable cause to search Disla Ramos's cellphone for communications between co-conspirators of the March 31, 2022 robbery, photographs of Disla Ramos with his co-conspirators, and photographs of the clothing that Disla Ramos wore during the robbery, but that the Government lacked probable cause to search for photographs of firearms, ammunition, and cash.

Finally, Disla Ramos argues that the search of the electronic devices seized from the premises was unreasonable because the warrant specifies no keywords or other limitation to cabin the government's search of his electronic data. Dkt. No. 24 at 31. Disla Ramos complains that this type of search permits the Government "to review everything without any effort to

simply look for documents relevant to the asserted probable cause during the execution of the search." *Id.* at 31–32.  Courts in this Circuit have repeatedly rejected identical arguments. "[O]utside the computer context, the Supreme Court has held that 'it is generally left to the discretion of the executing officers to determine the details of how best to proceed with the performance of a search authorized by warrant.'" *Vilar*, 2007 WL 1075041, at *37 (quoting *Dalia v. United States*, 441 U.S. 238, 257, (1979)).  The rule is no different for searches of electronic devices; "while the warrant must state with particularity the materials to be seized from a computer, the warrant need not specify how the computers will be searched." *Id.* at *37.

"To be sure, the Government must reasonably limit its initial search, taking only those steps reasonably necessary to identify documents responsive to the warrant." *United States v. Weigand*, 482 F. Supp. 3d 224, 242 (S.D.N.Y. 2020), *as corrected* (Sept. 2, 2020).  But the warrant need not require the use of search terms or prescribe a search methodology.  The rationale behind this rule is clear:  "in most instances, there is no way for law enforcement or the courts to know in advance how a criminal may label or code his computer files and/or documents which contain evidence of criminal activities." *United States v. Graziano*, 558 F. Supp. 2d 304, 315 (E.D.N.Y. 2008).  As a result, "to require courts in advance to restrict the computer search in every case to certain methodologies or terms would give criminals the ability to evade law enforcement scrutiny simply by utilizing coded terms in their files or documents." *Id.*; *see also Weigand*, 482 F. Supp. 3d at 241 ("[F]ew people keep documents of their criminal transactions in a folder marked 'drug records.'" (quoting *Riley*, 906 F.2d at 845)).  As the Second Circuit has summarized,

> [I]t will often be impossible to identify in advance the words or phrases that will
> separate relevant files or documents before the search takes place, because officers
> cannot readily anticipate how a suspect will store information related to the charged
> crimes.  Files and documents can easily be given misleading or coded names, and

words that might be expected to occur in pertinent documents can be encrypted; even very simple codes can defeat a pre-planned word search.

*Ulbricht*, 858 F.3d at 102.  It does not follow that "investigators [have] free reign'; "their conduct will always be subject to a subsequent reasonableness review."  *Vilar*, 2007 WL 1075041, at *37.  "A search must be confined to the terms and limitations of the warrant authorizing it."  *United States v. Matias*, 836 F.2d 744, 747 (2d Cir. 1988).  Where the executing agents have "flagrantly disregarded" the warrant's terms, suppression may be warranted.  *Id.*

However, with respect to a review of the execution of the search of the electronic devices and the suppression of evidence, the motion is not yet ripe.  The Government represents that the search is ongoing.  *See* December 5, 2022 Hearing Tr. 45.  It is premature to review whether the agents flagrantly disregarded the terms of the Premises Warrant during their search of the electronic devices.  It is similarly premature to determine whether the inclusion of references to photographs of firearms, ammunition, and cash caused the agents to reach beyond what the warrant otherwise authorized and, if it did, whether any evidence seized in the process would be permitted either by the good faith exception or by the plain view doctrine.  Thus, the motion to suppress based on the execution of the warrant is denied without prejudice to renewal upon completion of the Government's search of Disla Ramos's cellphone.

## III.    The Motion to Suppress Rosario's Statements

Rosario moves to suppress his post-arrest statements on the grounds that they were elicited after he unequivocally invoked his Fifth Amendment right to remain silent.  *See* Dkt. No. 22 at 9–10.  He contends his assertion that "I don't want to talk nothing" was an unequivocal invocation of his rights and that law enforcement did not "scrupulously honor[  ]" his invocation under *Michigan v. Mosley*, 423 U.S. 96 (1975), when they reinitiated interrogations ten minutes later.  *See id.* at 10–13.  For the first time in reply to the Government's Omnibus Memorandum

of Law in Opposition, Rosario further argues that the *Miranda* waiver was obtained through deception because the law-enforcement agents bartered something which they were required to provide under Federal Rule of Criminal Procedure 4(c)(3)(A)—Rosario's arrest warrant—for his statement.  *See* Dkt. No. 32 at 4–6.

A suspect in custody has a Fifth Amendment right to remain silent and to refuse to answer law enforcement's questions.  *See Miranda v. Arizona*, 384 U.S. 436, 479 (1966).  "[A]n accused who wants to invoke his or her right to remain silent [must] do so unambiguously;" a statement that is "ambiguous or equivocal" is not sufficient to invoke that right to remain silent. *Berghuis v. Thompkins*, 560 U.S. 370, 381 (2010); *see also United States v. Plugh*, 648 F.3d 118, 124 (2d Cir. 2011) ("[T]he *Berghuis* Court made clear that for a defendant successfully to invoke his *Miranda* rights, he must do so through a clear, unambiguous affirmative action or statement.").  The standard is objective, not subjective.  *See Berghuis*, 560 U.S. at 381 ("A requirement of unambiguous invocation of *Miranda* rights results in an objective inquiry that 'avoid[s] difficulties of proof and . . . provide[s] guidance to officers' on how to proceed in the face of ambiguity." (quoting *Davis v. United States*, 512 U.S. 452, 458–59 (1994))).  It turns on the words that the suspect utters to law enforcement and the acts he undertakes in their presence, not on a post-hoc inquiry into his intent.  *Id.*  The cases instruct that the court is not to put a thumb on the scale.  A requirement that the authorities cease questioning in the face of an ambiguous statement would not only "requir[e] [police] to make difficult decisions about an accused's unclear intent and face the consequences of suppression 'if they guess wrong,'" *Berghuis*, 560 U.S. at 382 (quoting *Davis*, 512 U.S. at 461), but it would also "transform the *Miranda* safeguards into . . . obstacles to legitimate police investigative activity, and deprive

suspects of an opportunity to make informed and intelligent assessments of their interests,"
*Mosley*, 423 U.S. at 326.

Once the suspect has unambiguously elected not to answer questions, that election must
be "scrupulously honored." *Mosley*, 423 U.S. at 103 (quoting *Miranda*, 384 U.S. at 479). The
authorities must immediately cease the interrogation and wait a sufficient amount of time before
reinitiating the interview with a new set of *Miranda* warnings. *See id.* at 105–06; *see also*
*Campaneria v. Reid*, 891 F.2d 1014, 1021 (2d Cir. 1989); *United States v. Dell' Aria*, 811 F
Supp. 837, 842-43 (E.D.N.Y. 1993). The *Mosley* court set out a number of factors to consider
when determining whether an invocation of Fifth Amendment rights was scrupulously honored,
including the amount of time that has passed before law enforcement reinitiated contact, whether
a different officer conducted the second interview, where the second interview was conducted,
and what was discussed during the second interview. *See Mosley*, 423 U.S. at 104–06.

Rosario argues that he invoked his Fifth Amendment right to remain silent
unambiguously when, in response to law enforcement questions, he stated "I don't want to talk
nothing" and refused to sign the waiver presented by law enforcement. Dkt. No. 22 at 9–10.
Rosario's case presents a close question, but the record ultimately does not support Rosario's
contention that his waiver was unequivocal. The transcript of the interrogation reflects that
before the officers read Rosario his rights, Rosario stated that "I don't know what you guys want
me to talk about, because I don't know what you guys are trying to talk about." *Id.* Ex. E at 1.
He added: "I don't want to talk nothing. Cause I don't know what's going on." *Id.* One agent
then read Rosario his rights, to which Rosario responded, "Yeah, I know all that." *Id.* He then
was offered the waiver form to sign and responded, "You want me to sign? No, I'm not— . . . .
No, I'm not signing that. Cause I don't know what's going on." *Id.* at 2. An agent stated: "If

54

you would like to know what's going on, the only way we can tell you what's going on is if you consent to speaking with us, okay." *Id.*  Rosario persisted in his refusal to sign the waiver and the agents left the room.  *Id.* at 4.  Approximately ten minutes later, the agents returned with a Spanish-speaking officer, who showed Rosario his federal arrest warrant.  *Id.* Ex. F at 1–2. Rosario then signed the *Miranda* waiver and the interrogation continued.  *Id.* at 6–7.

As an initial matter, Rosario's refusal to sign the *Miranda* waiver did not constitute an unequivocal invocation of his right to remain silent.  "[A] refusal to *waive* rights, however unequivocal, is not necessarily equivalent to an unambiguous decision to *invoke* them." *Plugh*, 648 F.3d at 124.  "Invocation and waiver are entirely distinct inquiries, and the two must not be blurred by merging them together."  *Smith v. Illinois*, 469 U.S. 91, 98 (1984).  Rosario's statements "unequivocally established that he did not wish to waive his rights *at that time*," but they were not sufficient to make clear he was he was "seeking to *invoke* his rights."  *Plugh*, 648 F.3d at 125.  Thus, Rosario's refusals to sign the form—no matter how many times and how clearly they were made—do not represent an invocation of his right to remain silent and did not prevent law enforcement from continuing the interrogation.

It presents a somewhat closer question whether Rosario invoked his right to remain silent when he said "I don't want to talk nothing."  "[A] suspect need not 'speak with the discrimination of an Oxford don.'"  *Davis*, 512 U.S. at 459 (quoting *Davis*, 512 U.S. at 476 (Souter, J., concurring)).  The *Berghuis* Court suggested that a statement by the accused "that he wanted to remain silent or that he did not want to talk with the police" would be sufficient to invoke his right to remain silent and to require law enforcement to cease questioning.  560 U.S. at 381.  In isolation, the statement "I don't want to talk nothing" would meet this standard.  *See United States v. Griffin-Bey*, 2022 WL 7060534, at *5 (E.D.N.Y. Oct. 12, 2022) (holding that "I

don't have anything to say" "in light of the entire context of the interrogation" was sufficiently unambiguous to represent a valid invocation of Fifth Amendment rights).  The statement, however, was not made in isolation.  It was preceded by a statement that Rosario did not know what to say because he did not know the context of the interrogation.  Dkt. No. 22, Ex. E at 1.  It was immediately followed by a statement that he did not know what was going on in the interrogation.  *Id.*  Thus, in context, Rosario's refusal to speak was conditional, qualified, and equivocal.  Rosario requested a quid pro quo; he conveyed to the agents that he might be willing to speak if he was given information about the interrogation.  In fact, that is precisely what happened:  Once he was shown his federal arrest warrant, Rosario signed the *Miranda* waiver and answered questions about the crimes.  *Id.* Ex. F at 4–7.

The Second Circuit's summary order in *United States v. Dawes*, 495 F. App'x 117 (2d Cir. 2012), is instructive.  There, the defendant twice asserted, "I plead the Fifth Commandment" at the beginning of his interview.  *Id.* at 119.  These assertions were immediately followed by a request "to know why I'm here."  *Id.*  The assistant district attorney then read the defendant his *Miranda* rights and asked whether he "wish[ed] to speak to me," to which the defendant responded, "Yes, sir."  *Id.*  The Circuit, citing *Berghuis* and *Plugh*, concluded that the defendant "did not unambiguously invoke his Fifth Amendment rights."  *Id.* at 120.  The court continued,

> Although Defendant mentioned the 'Fifth Commandment' before the interrogation began, this reference cannot be construed as an unequivocal invocation of the Fifth Amendment in light of Defendant's nearly simultaneous comments and conduct. Defendant may have stated, 'I plead the Fifth Commandment,' but he immediately queried, 'I want to know why I'm here,' indicating thereby he had not unequivocally asserted his Fifth Amendment rights.

*Id.*

So too here does the Court conclude that the statement does not meet the *Berghuis* standard for unambiguousness. Rosario's statement that he did not wish to speak was immediately preceded and followed by statements that Rosario did not understand why he was arrested. In this context, Rosario's invocation of his right to remain silent was ambiguous and did not prevent the agents from showing Rosario his arrest warrant or continuing the interrogation after reading Rosario his rights and obtaining a signed waiver of those rights. That was precisely what Rosario was requesting and that is what law enforcement delivered.[14]

Rosario's remaining two arguments that the eventual waiver was obtained through coercion are meritless. *See* Dkt. No. 32 at 5–6. "A Miranda waiver is voluntary 'when the relinquishment is the product of a free and deliberate choice rather than intimidation, coercion, or deception.'" *United States v. Brewster*, 2021 WL 3423521, at *6 (S.D.N.Y. Aug. 5, 2021) (quoting *United States v. Medina*, 19 F. Supp. 3d 518, 538 (S.D.N.Y. 2014)). "Whether a confession is a product of coercion may only be determined after a careful evaluation of the totality of all the surrounding circumstances, including the accused's characteristics, the conditions of interrogation, and the conduct of law enforcement officials." *United States v. Anderson*, 929 F.2d 96, 99 (2d Cir. 1991). "[T]he Supreme Court has found that affirmative misrepresentations by the police may be sufficiently coercive to invalidate a suspect's waiver of the Fifth Amendment privilege." *Id.* at 100.

Rosario argues that the *Miranda* waiver was obtained through conversion (1) because the agents gave Rosario "false legal advice" when they said that signing the form would indicate that Rosario understood his rights, and not that Rosario was waiving his rights and consenting to

---

[14] Because the Court finds that Rosario did not unambiguously invoke his right to silence, it need not address whether the agents "scrupulously honored" his invocation of that right under *Mosley*. *See* 423 U.S. at 103–106.

questioning, and (2) because the agents bartered something—Rosario's arrest warrant—which they were required to provide under Federal Rule of Criminal Procedure 4(c)(3)(A).  *See* Dkt. No. 32 at 4–6.  Neither action, in context of the entire interrogation, was coercive.

Rosario takes issue with the fact that the agents, on at least two occasions, indicated that all the *Miranda* waiver represented was that he "understood [his] rights.  That is all that you're signing."  Dkt. No. 22, Ex. F at 2; *see also id.* Ex. E at 1 ("All this form says is, before we ask you any questions, you must understand your rights.").  The *Miranda* waiver that Rosario signed is of course broader than a reflection of an understanding of Fifth Amendment rights; it also is an explicit acknowledgement that "I am willing to answer questions without a lawyer present."  *Id.* Ex. B at JR_000006.  Rosario's contention, however, fails for two independent reasons.  First, the agents read Rosario the entire waiver during the first part of the interview, including the consent paragraph, at least partially correcting their misrepresentation that the waiver only reflected Rosario's understanding of his Fifth Amendment rights.  *See id.* Ex. E at 2.

Second, the Supreme Court has held that an "[a]n express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver, but is not inevitably either necessary or sufficient to establish waiver. . . . [I]n at least some cases waiver can be clearly inferred from the actions and words of the person interrogated."  *North Carolina v. Butler*, 441 U.S. 369, 373 (1979).  "That is because 'the law can presume that an individual who, with a full understanding of his or her rights, acts in a manner inconsistent with their exercise has made a deliberate choice to relinquish the protection those rights afford.'"  *Plugh*, 648 F.3d at 127 (quoting *Berghuis*, 560 U.S. at 385).  Rosario clearly understood his Fifth Amendment rights; the agents discussed his rights with Rosario in both English and in Spanish, *see generally* Dkt. No. 22, Ex. E & Ex. F, and Rosario indicated

that he understood his rights on several occasions, *see, e.g.*, *id.* Ex. E at 2 ("Yeah, I know all that.").  Further, Rosario does not contest that the waiver form he signed is at least broad enough to cover his understanding of his rights to silence and an attorney.  And, with his understanding of his right to remain silent and right to an attorney, Rosario acted in a manner inconsistent with these rights by persisting in questioning the agents—and answering questions from the agents—about his federal charges.  *See id.* Ex. F at 7–15.  Thus, even assuming *arguendo* that the waiver form was invalid, Rosario implicitly waived his rights through his course of conduct during the interrogation.  *See United States v. Lynch*, 92 F.3d 62, 66 (2d Cir. 1996) ("The fact that [the arrestee] was making statements about his case and was asking questions about the evidence in his case after first having been advised of his *Miranda* rights indicates that [the arrestee] was not interested in invoking his constitutional rights and that he wished to talk to [the agent] about his case."); *United States v. Valdez*, 2017 WL 819491, at *13 (S.D.N.Y. Feb. 28, 2017) (finding valid implicit waiver when, "after receiving *Miranda* warnings at the Sheriff's Office, and after acknowledging that he understood his rights, [the defendant] spoke with [law-enforcement officers] in a manner inconsistent with the exercise of those rights").  .

Nor did the agents' attempts to barter something, which they were legally obligated to provide—access to Rosario's arrest warrant—make Rosario's waiver involuntary.  Federal Rule of Criminal Procedure 4(c)(3)(A) provides, "Upon arrest, an officer possessing the original or a duplicate original [arrest] warrant must show it to the defendant."  Here, Rosario repeatedly requested to know the nature of the interrogation before signing the *Miranda* waiver.  *See, e.g.*, Dkt. No. 22, Ex. E at 2 ("No, I'm not signing that. Cause I don't know what's going on.").  The agents, however, asserted that they were unable to tell him "why [he has] been arrested by the FBI" until he signed the *Miranda* waiver.  *Id.* at 3.  Rosario's argument can be understood as

suggesting that because the FBI attempted to barter something they were legally required to share with Rosario, Rosario's waiver of his Fifth Amendment rights was coerced. This argument fails for two reasons. First, Rosario *was* shown his arrest warrant before he signed the waiver; the agents eventually acquiesced to Rosario's request and allowed him to review his arrest warrant. *See id.* Ex. F at 5. Thus, the agents' attempts to trade knowledge about Rosario's arrest for the waiver could not have been coercive, because the agents did not, in fact, make this trade.[15]

Second, the Supreme Court has held that a suspect need not know all the crimes about which he may be questioned for a *Miranda* waiver to be valid. *See Colorado v. Spring*, 479 U.S. 564, 577 (1987). In *Spring*, the defendant argued that his *Miranda* waiver was invalid because he was not informed that he might be questioned about a murder. *Id.* at 855. The Court, however, rejected this argument. The Court first observed that the defendant's "allegation that the police failed to supply him with certain information does not relate to any of the traditional indicia of coercion." *Id.* at 574. It then held that the officers were not required to share all of a defendant's crimes before receiving a *Miranda* waiver because "the additional information could

---

[15] Recognizing this flaw in his reasoning, Rosario next argues that "[t]here is no reasonable argument that this deception did not factor into Rosario's ultimate decision to sign the *Miranda* waiver form, even though he did so after reviewing a copy of the arrest warrant." Dkt. No. 32 at 5. This argument, however, is belied by the record. After reviewing the arrest warrant, Rosario requested additional information about his arrest and the charged crimes. *See* Dkt. No. 22, Ex. F at 5. However, the agents refused to share more information until Rosario signed the waiver. *See id.* at 5–6. The record thus suggests that Rosario's waiver was motivated by learning additional information about the charged crimes, which the Second Circuit has held is not coercive. *See Lynch*, 92 F.3d at 66 ("[The Agent] told [the arrestee] that, 'if [he] wish[ed] to speak to agents' and to have '[q]uestions pertaining to the investigation' answered, he would have to sign the waiver form. . . . [The Agent's] statement to Lynch did not present the same type of ultimatum that" would make the agent's actions coercive.); *United States v. Tutino*, 883 F.2d 1125, 1138 (2d Cir. 1989) (holding that once the arrestee "had been advised of his rights, the agents were free to discuss with him the evidence against him and the reasons why he should cooperate").

affect only the wisdom of a *Miranda* waiver, not its essentially voluntary and knowing nature." *Id.* at 577; *see also id.* ("Accordingly, the failure of the law enforcement officials to inform Spring of the subject matter of the interrogation could not affect Spring's decision to waive his Fifth Amendment privilege in a constitutionally significant manner.").  If law enforcement is not required to share information about an arrestee's crimes for a waiver to be valid, it follows that, absent more, offering to trade that information for a *Miranda* waiver cannot be coercive.[16]

In fact, the agents' actions can be viewed as protective, both of Rosario and of themselves.  Both before and after Rosario was shown his arrest warrant, he was eager to understand that nature of the charges against him.  However, instead of taking steps that could be understood as attempting to press the interrogee to make incriminating statements, the agents insisted that Rosario demonstrate that he understood his rights and freely waived them before they further described the basis for the charges in the arrest warrant.  Thus, rather than coercing Rosario into signing away his rights, the agents' actions were entirely consistent with, if not mandated by, their constitutional obligations to safeguard Rosario's Fifth Amendment rights.

The Court thus will not suppress Rosario's post-arrest statements.

---

[16] One of the rationales given for Rule 4(c)(3)(A) is that "by informing [an arrestee] of the warrant and charges against him, the Rule might safeguard an arrestee's privilege against self-incrimination." *Bryson v. United States*, 419 F.2d 695, 701 (D.C. Cir. 1969).  Putting aside the fact that Rosario was in fact given this information before his potentially incriminating statement were given, Rosario's Fifth Amendment privilege was safeguarded by his knowing and voluntary waiver of that privilege during his interrogation.

**CONCLUSION**

Disla Ramos's motion to suppress evidence seized pursuant to the two search warrants is

DENIED IN PART and DENIED IN PART WITHOUT PREJUDICE TO RENEWAL and

Rosario's motion to suppress his post-arrest statements is DENIED.  The Clerk of Court is

respectfully directed to close Dkt. Nos. 20 and 23.


     SO ORDERED.

Dated: December 21, 2022
     New York, New York

                               LEWIS J. LIMAN
                       United States District Judge